**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HEMPFIELD SCHOOL DISTRICT** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 23-2800** |
| | **:** | |
| **S.C., M.C. and S.R.-A** | **:** | |

## MEMORANDUM

**KEARNEY, J.**                                    **January 31, 2024**

Teaching young children on the autism spectrum is a special calling. Finding qualified teachers and professionals to teach kindergarten and first grade students on the autism spectrum during a worldwide pandemic presented greater challenges for school administrators. Teachers leave and the schools must still teach. The schools must be mindful Congress mandates the states accepting federal education funds provide a free appropriate public education to students in their district and must hire the staff to do so.  And the school district must reimburse parents forced to pay tuition at another school if the school district cannot provide the required education.

We today review a hearing officer's findings a Lancaster County school district partially met its obligations to the student for the kindergarten and first grade years beginning in November 2020.  We agree with the hearing officer in part.  The District did not provide a free appropriate public education to the child on the autism spectrum during the entirety of the kindergarten and first grade years.  The student is entitled to compensatory education.  We remand to the hearing officer for a non-arbitrary finding as to the amount of compensatory education. The District must compensate the child's parents for tuition paid to a district who provided services.  We are not persuaded by the District's arguments.  Ordering it reimburse the parents for tuition paid to a neighboring public school district does not violate the Constitution's Spending Clause as the State is on ample notice of its obligation to provide the appropriate education and reimburse

demonstrated tuition when it cannot meet its obligations.   The parents are entitled to reimbursement of their tuition payment and reasonable attorney's fees but must now timely demonstrate the amount and reasonableness of the tuition and reasonable attorney's fees before we can enter a final judgment.

We do not suggest the District acted in malice or ignorance; it tried to meet its obligations to its student with stopgap coverage resulting in largely ineffective steps without special education teachers or appropriate training. But the record confirms it did not meet its obligations to this young student in its District for part of his kindergarten and first grade years.

## I.   Facts developed during the due process hearing.

S.C. is a nine-year-old student with autism and a speech and language impairment.[1] Physicians diagnosed S.C. with a cleft palate making it difficult for him to make certain sounds.[2] S.C. requires specially designed instruction throughout his school day to support his development of verbal and nonverbal communication skills and make progress in his education. S.C. began attending school in the Hempfield School District in kindergarten and received special education services.[3] Hempfield District always provided the eligible S.C. with special education services while attending the Hempfield District school.[4]

### *S.C. receives early intervention services.*

S.C. received early intervention education services as a preschool student with autism through the Lancaster-Lebanon Intermediate Unit 13 beginning in 2017.[5] Lancaster-Lebanon Intermediate Unit 13 developed an individualized education program (IEP) for S.C. in May 2017.[6] The IEP team set measurable goals related to, among other things, building S.C.'s social interaction skills and his ability to listen to and follow teacher instructions. The IEP Team met at least annually to discuss S.C.'s progress toward his goals and revise the IEP based on recommendations from S.C.'s teachers, service providers, and his Parents.[7]

### *Preparing for S.C.'s transition to a school-age program.*

S.C.'s Parents planned to transition S.C. from early intervention services, which are only two-and-a-half hours of instruction per day, to an all-day school age program in the Hempfield School District for the 2020-2021 school year. The District issued a Reevaluation Report finding S.C. still qualified for special education and related services under the primary eligibility category of autism and secondary eligibility category of speech or language impairment.[8] The Hempfield School District then convened an IEP team meeting with S.C.'s Parents to prepare for S.C.'s transition to school-age programming.

### *S.C.'s June 2020 IEP for kindergarten.*

The IEP Team developed a school-age IEP in June 2020 to be implemented through S.C.'s 2020-2021 kindergarten year in the Hempfield School District.[9] The IEP required the District provide S.C. with all of his academic instruction in an autistic support classroom using a modified curriculum.[10]

The IEP team set annual goals in the June 2020 IEP including: (1) functional communication (communicating wants and needs, labeling items, following simple one-step directions), (2) requesting (also referred to as "manding," meaning the ability to independently ask for desired objects and activities), (3) imitation (immediately following instructions prompting him to "do this"), (4) following one-step directions, (5) echoics (repeating spoken verbalizations), (6) tacting (identifying and labeling pictures laid out on table), and (7) visual-motor/fine motor skills (tracing, coloring, cutting, writing name, and closing fasteners on practice boards).[11]

Program modifications and items of specially designed instruction included a timed-toileting program, use of behavior protocols to increase safety awareness, escort to and from the bus each day, a communication log between home and school, a personal care assistant for five-and-a-half hours per day, individualized and small group instruction, a pair teaching environment,

use of a wide variety of reinforcers (including toys and edibles), errorless teaching procedures, interspersing easy and difficult demands, fast-paced instruction, transportation to and from school, mixed and varied types of instructional demands, promised reinforcers for transitioning to less preferred activities, prompts for grasp, guided practice for visual motor and self-care tasks, assistance for self-care tasks, a feeding protocol, speech and language therapy, and occupational therapy.[12]

The IEP provides his progress on certain goals, including tacting and following one-step directions, would be measured through daily probes. S.C.'s progress would be assessed on a trimester basis. S.C. would spend approximately 85% of his day in special education settings and the remaining 15% in a regular classroom.[13] S.C.'s parents approved the District IEP on June 8, 2020.[14]

### *S.C. attends kindergarten in the Hempfield School District (2020-2021 school year).*

S.C. began kindergarten in the Hempfield School District in August 2020.[15] S.C. was primarily non-verbal and used gestures to communicate his wants and needs.[16] S.C. had a difficult transition to kindergarten in part because he had a lot of self-stimulatory behaviors.[17] He also had poor instructional control, meaning he had a short attention span, was easily distracted, and he struggled to sit still and follow the teacher's directions.[18] S.C. struggled to maintain his attention during a task, but he did not exhibit aggressive or destructive behaviors.[19]

The District educated S.C. in an autism support classroom using a verbal behavior methodology to teach functional skills and communication such as manding (requesting), tacting (labeling or identifying certain objects), listening, playing and socializing with peers, and following simple one-step directions.[20] The autistic support classroom had mostly nonverbal students who were not toilet trained, including students who "eloped" (tried to escape) and self-injurious students.[21]  The autism support classroom used a curriculum called the Verbal Behavior

Milestones Assessment Placement Program designed to teach, track, and assess skills of students with autism based on verbal behaviors and established developmental milestones.[22]

S.C.'s kindergarten autism support class included a special education teacher, four classroom aides, and six to eight students at any one time.[23] The classroom teacher Chanel Yoder and aides were all trained in how to deliver verbal behavior programming.[24]

The special education teacher is responsible for creating individualized programming for all students based on their skill deficits, conducting behavioral assessments, and training other classroom staff in how to collect data and implement individualized programming in the classroom.[25] The classroom aides rotate between students throughout the day and are responsible for executing classroom routines, implementing students' individualized education programs, tracking student behaviors and program-related skills, and assisting students with daily living skills including feeding, toileting, unpacking bags, and transitioning between settings.[26]

Kimberly Hilton and Audrey Dulio worked as classroom aides in the District's autism support classroom for S.C.'s kindergarten school year and from August 2021 to November 2021 of S.C.'s first grade school year. They were both trained in the verbal behavior program. They testified at the due process hearing about the learning environment in the District's autistic support classroom, including student programming and behavioral issues.

The District assigns its Director of Special Education Denise Galen responsibility for hiring and supporting special education teachers and support staff, overseeing special education programming within the department, and ensuring compliance with applicable regulations.[27]

### The District conducts initial testing for S.C.

The District conducted assessments to gauge S.C.'s education levels in September 2020.[28] The District used a Verbal Behavior Milestones Assessment to measure S.C.'s learning and language skills.[29] Teachers often use the Milestones Assessment with students who have autism

or language impairments.[30] The Milestones Assessment is designed to measure a student's strengths and weaknesses in a variety of developmental learning and language milestones.[31] The Milestones Assessment is divided into three developmental levels: (1) 0 to 18 months, (2) 18 to 30 months, and (3) 30 to 48 months.[32]

S.C. took the Milestones Assessment several times before he started his school-age program in the District. He scored 63 points on the Milestones Assessment in February 2020.[33] When his teacher administered the Milestones Assessment in September 2020, S.C. scored only 38 points, suggesting S.C. regressed in his language skills.[34] S.C. exhibited many milestones at the 0-18 months level and scattered milestones at the 18-30 months and 30-48 months levels.[35] S.C.'s special education teacher reviewed S.C.'s performance on the Milestones Assessment to develop an individualized learning program to address S.C.'s skill deficits.[36]

### S.C.'s special education teacher Ms. Yoder goes on leave.

The District notified Parents S.C.'s classroom teacher Ms. Yoder took maternity leave in October 2020.[37]

Danielle Frederick, the District's internal autism support coach, notified S.C.'s Parents she would assume the role of classroom teacher until the District could find a long-term substitute.[38] Autism Coach Frederick is a highly trained special education teacher with seventeen years of teaching experience in the District.[39] As an internal autism support coach, her duties included rotating a day in each of the six autism classroom in the District, training new staff, assessing students, conducting behavioral observations, and developing instruction for students.[40]

Autism Coach Frederick was not in the classroom on a daily basis once the regular classroom teacher left because she had to attend to her full-time job overseeing other autism support classrooms in the District.[41] Classroom aides Hilton and Dulio inquired about receiving special education emergency certifications to fill the role as "joint teachers."[42] Director Galen told

them they were not eligible for emergency certification because they did not have a teaching certification or education beyond high school.[43]

### The District IEP team meets in October 2020 to revise S.C.'s IEP.

The IEP team met in October 2020 to discuss revisions to S.C.'s IEP.[44]  The IEP team made two revisions to the June 2020 IEP. They agreed to assess S.C.'s academic performance in English Language Arts and Math in accord with the District's kindergarten curriculum/standards.[45] They also added specially designed instruction geared toward improving S.C.'s activities of daily living, including providing S.C. support with toileting readiness skills by having staff accompany him to the toilet at least once every thirty minutes and teach him how to use the toilet.[46]

The annual goals, specially designed instruction, and modifications in the October 2020 IEP otherwise remained the same as in the June 2020 IEP. S.C. would continue to spend approximately 85% of the day in the autistic support classroom.[47]

### The autism support classroom experiences staffing issues.

The District never hired a long-term substitute teacher.[48] Autism Coach Frederick continued to fill the role of classroom teacher but she was not present in the classroom all day or every day because she still had to fulfill her role as autistic support coach in other classrooms.[49] Autism Coach Frederick swore she taught in the classroom two to three days a week because the District could not find a substitute every day.[50]  She spent more time in the classroom toward the end of the school year.[51]

The District staffed the classroom with multiple day-to-day substitute teachers, none of whom had any training in verbal behavior programming.[52] The substitute teachers included a librarian, a chiropractor, and a college student who did schoolwork during the day.[53]

The District granted a few of the substitute teachers an allotment to substitute in the classroom for no more than twenty days as required by state law.[54] Other substitutes were in the

classroom for only one day and did not return.[55] There were also days where the speech therapist and the occupational therapist would teach the class for the entire day.[56] Classroom aides Dulio and Hilton swore one of the other classroom aides missed "at least 25" days, or "a month to six weeks," of the school year.[57]

The record is not clear as to teacher presence in the classroom. Classroom aides Dulio and Hilton testified there were a few days when there was no teacher in the class.[58] But Autism Coach Frederick testified she does not recall days when there was no teacher.[59] Director Galen did not know of any time during S.C.'s kindergarten or first grade years when the classroom did not have a teacher.[60]

The substitute teachers could not carry out the programming in the autistic support classroom due to their lack of training.[61] They were generally placed with the "easiest" children.[62] S.C. would not be paired with a substitute except for a brief session because his program was more complex.[63] Classroom aides Dulio and Hilton swore it felt like "having another student" or "another body" in the classroom because the substitute teachers were not trained and were generally unhelpful.[64]

Classroom aide Hilton swore the classroom aides were confused how to implement S.C.'s complex programming on the days when Autism Coach Frederick was out of the classroom and a substitute taught.[65] Classroom aides Dulio and Hilton swore there were days when they were unable to implement any of S.C.'s programs because they were so focused on trying to keep the kids in the classroom safe.[66] The students did not regularly go out to recess or leave the classroom for specials or lunch because it was dangerous.[67]

Daily staffing issues, including staffing of aides and day-to-day substitute teachers, is handled by building-level administration. Classroom aides Dulio and Hilton swore they repeatedly shared concerns about staffing with building-level administrators and other educators in the

building but their concerns were not addressed.[68] They felt overwhelmed by the behavior and needs of the students in the classroom and undervalued by the administration.[69] Director Galen swore she never received any communication from S.C.'s classroom aides, teachers, or principal indicating staffing was a major concern during the 2020-2021 school year, although some staff reached out to her asking about the District's progress in finding a new teacher for the autistic support classroom.[70] Director Galen testified she only started to hear about staffing concerns in S.C.'s classroom during the Fall of his first grade year.[71]

S.C.'s regular classroom teacher who went on maternity leave in the Fall notified the District she resigned and a permanent replacement would need to be found in February 2021.[72] S.C.'s Parents did not learn there were substitute teachers in the kindergarten classroom until Fall 2021 when S.C. was in first grade.[73]

### Autism Coach Frederick assesses S.C. in November 2020.

Autism Coach Frederick administered the Verbal Behavior Milestones Assessment again in November 2020.[74] S.C. scored 63 points on the assessment.[75] S.C. showed particular strengths in academic areas including reading, writing, and math.[76] Autism Coach Frederick also administered a "Barriers Assessment" which measured S.C.'s learning and language acquisition barriers, including, among other things, behavior problems, poor instructional control, defective social skills, defective listener skills, self-stimulation, and failure to make eye contact.[77]

The results showed S.C. struggled with requesting help or materials from others, answering questions or having a conversation, and socializing with his peers.[78] The results also showed S.C. had poor instructional control and a high level of sensory defensiveness, meaning he reacted to specific sensory stimuli with "escape behavior"—e.g., hands over ears, closing eyes, getting agitated.[79] But S.C. first learned to speak some words in Kindergarten despite these difficulties.[80]

***The IEP team develops a new IEP for S.C. January 2021 IEP.***

The District and Parents developed a new IEP in January 2021 to be implemented through S.C.'s first grade year.[81]

The IEP team set annual goals in the January 2021 IEP including: (1) functional communication (developing skills similar to those in the earlier IEP but with increased difficulty); (2) manding (same goal as in earlier IEP), (3) imitation (developing skills similar to those in the earlier IEP but with increased difficulty), (4) following one-step directions (developing skills similar to those in the earlier IEP but with increased difficulty), (5) echoics (same goal as in earlier IEP), (6) following "noun-verb" directions (e.g., "show me the marker"), (7) visual-motor and fine motor skills (developing skills similar to those in the earlier IEP but with increased difficulty); (8) reading comprehension (vocabulary and decoding), (9) addition and subtraction, and (10) speech intelligibility.[82]

The speech and language therapist indicated in the January 2021 IEP S.C. made substantial progress toward his first IEP goal related to speech therapy and functional communication.[83] The IEP team revised S.C.'s speech goals due to progress he made since September 2020.[84] The occupational therapist indicated S.C. "made good progress" toward his IEP goals for visual-motor and fine motor skills goals but noted S.C. continued to struggle with independently completing visual motor and self-care tasks in school.[85]

The District proposed to continue much of what it previously provided to S.C. in terms of items of specially designed instruction and modifications. S.C. would continue to receive speech and language therapy, occupational therapy, and a personal care assistant for five-and-a-half hours a day. The IEP team removed the more intensive "timed toileting" program from the IEP but the plan still required the staff support S.C. with toilet readiness skills by accompanying him to the toilet every thirty minutes.[86]

S.C. would continue to spend approximately 85% of the day in the autistic support classroom.[87] The District found S.C. qualified for extended school year services during the summer.

### District hires a special education teacher for the autistic support classroom.

The District finally hired a classroom teacher, Emily Haws, in late May 2021 near the end of the 2020-2021 school year.[88]

### S.C.'s educational progress from January-May/June 2021.

S.C. received the following marks on his progress reporting for March through December 2021:

- "Not proficient" for his functional communication skills goals in both March and May 2021 but he made some progress toward his goals;[89]

- "Not proficient" for his manding goal in March, June, and December 2021 but he made some progress toward his targets;[90]

- "Not proficient" for his goal of following one-step directions in March, June, and December 2021 but he made some progress toward his targets;[91]

- "Mastered" his goal of repeating verbalizations by June 2021 and continued to make progress as of December 2021;[92]

- "Not proficient" for his goal of following noun-verb directions, which was placed "on hold" from March through December 2021 due to poor instructional control;[93]

- "Partially proficient" for his visual motor and self-care tasks goal in March, May, and December 2021 but S.C. made progress toward his targets;[94]

- "Partially proficient" for his vocabulary and decoding goals in March 2021, but Autism Coach Frederick noted S.C.'s "performance is inconsistent and progress is slow."[95] The District neglected to even report on this goal in June 2021, but marked him "mastered" as of December 2021;

- "Not proficient" on his math goals in March, June, and December 2021. Teacher Haws noted "instructional control is weak, therefore performance is inconsistent and progress toward learning new skills is at a standstill.";[96]

- "Not proficient" on his speech intelligibility goal in May 2021 but his speech therapist notes S.C. learned "15 new words with trimester;"[97] and,

- "Mastered" his goal of performing at least 30 new motor actions by June 2021, but Teacher Haws' notes suggest S.C. only demonstrated mastery of 18 actions.[98]

Autism Coach Frederick swore she did not see problems with S.C.'s progress despite the staffing issues.[99] She swore S.C. made "good progress" during the kindergarten school year.[100] Classroom aides Hilton and Dulio swore S.C. is "very smart" and he could have progressed more if he had more one-on-one support.[101]

### *S.C. returns to autistic support classroom at the beginning of the 2021-2022 school year.*

S.C. returned to the District for the 2021-2022 school year with the January 2021 IEP in effect. Teacher Haws continued as the autistic support classroom teacher for first grade.[102] The autistic support classroom included seven to eight students and three classroom aides – one less than the year before.[103] Classroom aides Dulio and Hilton continued to work as classroom aides for S.C.'s first grade year.[104] The other classroom aide missed approximately two weeks of school for personal reasons.[105]

Classroom aide Hilton identified times when the aides were just "babysitting" the students in the autistic support classroom and "learning wasn't happening."[106] Another aide confirmed "hours missed everyday" dealing with behavioral issues.[107] When a student displayed an unsafe behavior, it often required two adults to address the situation and one adult to keep the remaining children safe—cutting into the students' intensive teaching time.[108] Teacher Haws swore she had a student who displayed aggression in the classroom requiring them to evacuate the other students for safety purposes.[109]

Teacher Haws noted staffing issues affected her ability to implement S.C.'s IEP goals with fidelity.[110] She admitted struggling to perform errorless teaching sessions, use fast-paced instruction, and provide S.C. regular toileting support.[111] Classroom aides Hilton and Dulio swore

12

they struggled to consistently implement S.C.'s programs due to staffing shortages and he regressed as a result.[112] Classroom aide Hilton believes S.C. "missed a year-and-a-half of learning."[113]

### *The staffing shortage worsens.*

Teacher Haws became increasingly concerned with staffing issues in late October 2021 when the more experienced classroom aides Dulio and Hilton indicated they may be leaving their positions.[114] Teacher Haws told Director Galen the two classroom aides were looking for new jobs.[115]

The Parents only learned of the staffing concerns in late October 2021 from conversations with fellow parents and the classroom aides.[116] The Parents emailed Director Galen expressing concerns the classroom is "chronically understaffed, with incorrect student to teacher ratios," they received reports faculty "are primarily focused on keeping the children safe and fed," and they are concerned about "the teacher's ability right now to meet educational requirements."[117] The Parents asked about a rumor they heard regarding two classroom aides seeking employment elsewhere. They also asked whether the speech therapist is on maternity leave and followed up on an earlier request for S.C.'s progress reports.[118] The Parents concluded the email by requesting Director Galen visit the classroom to check on the conditions.[119] Director Galen did not recall if she had ever visited the classroom during the previous school year.[120]

Director Galen then told Parents (only after they inquired) the speech therapist is on maternity leave on November 5, 2021.[121] The District told Parents it had hired a substitute speech therapist, but there would be fourteen days without a therapist before the new therapist started.[122] The District offered compensatory sessions—either during the day or after school—to make up for the missed sessions of speech therapy.[123] The Parents and the District dispute whether S.C. received these compensatory sessions. The Parents swear S.C. left the District before it provided

compensatory sessions.[124] Director Galen disagrees, claiming the District provided S.C. with all of his compensatory sessions before he left the District.[125]

The Parents asked for a meeting and the District met to discuss Parents' concerns about staffing and review S.C.'s progress on November 10, 2021.[126] The District told the Parents of no applications/resumes for the open positions. The Parents discussed a number of options for addressing the problem with the District but left the meeting feeling as though the District did not have a plan to remedy the situation.[127]

### Classroom aides Hilton and Dulio leave the District in November 2021.

Classroom aides Hilton and Dulio left the District's employ in November 2021 frustrated the children in the classroom were not getting enough educational support.[128] The Parents later asked for letters from the two former aides regarding their views of the staffing issues over S.C.'s kindergarten and first grade years.[129] Ms. Dulio, who has a child with autism and an IEP, and Ms. Hilton, who has children educated by the District, both expressed feeling like the children in S.C.'s autistic support classroom "deserved better" because they lacked the services they needed and did not have a voice to tell their parents about the conditions in the classroom.[130] Classroom aides Hilton and Dulio both described how their repeated requests for assistance from the District fell on deaf ears and how they believed the children in the autism support classroom "deserved better."[131] Classroom aides Dulio and Hilton swore they left the District because they did not want to be a part of "the problem" anymore and hoped their departures would alert the District to the severity of the conditions in the classroom.

The Parents learned in early December of classroom aides Dulio's and Hilton's departure only after contacting Teacher Haws for a list of teachers to whom they could send Christmas cards.[132] Teacher Haws then told the Parents of classroom aides Dulio and Hilton leaving and they were "[c]rossing [their] fingers for more staff soon!"[133]

*Parents enroll S.C. at Warwick.*

The Parents began to investigate schooling options for S.C. outside of the District in November 2021 after they learned the severity of the District's staffing shortage.[134] The Parents swore they vetted all private school options within a sixty-mile radius and toured some of the schools with S.C.[135] The Parents could not find a suitable private school for S.C. within this radius.

Parents heard a public school in the neighboring Warwick School District had a strong special education program.[136] Parents were not residents of the Warwick School District. They reached out to Warwick to see if they could pay tuition for S.C. to enroll in their autistic support program.[137] Warwick School District's Assistant Superintendent Melanie Calendar testified Parents' unilateral outreach presented a "unique situation" because typically Warwick contracts directly with school districts about student transfers.[138] Assistant Superintendent Calendar confirmed the Warwick Board of Directors' policies permitted them to offer S.C. placement in their program.[139] They decided to enroll S.C. in an out-of-district placement at Warwick. Parents paid the out-of-pocket tuition rate to secure S.C.'s placement at Warwick.[140] Parent testified they paid $15,407.84 to enroll S.C. in the Warwick District school.[141]

Parents told the District in late November of their intent to withdraw S.C. from the District and enroll him as a student in the Warwick School District.[142] Parents explained they wanted to give S.C. a chance to attend a fully-staffed autism classroom and they "hope that this is a temporary move."[143] They also note the staffing shortage and their withdrawal "is not the result of your team doing anything wrong."[144] There was only one teacher and one aide in the autistic support classroom at the time the Parents decided to enroll S.C. in the Warwick School District, with intermittent support from Autism Coach Frederick, the occupational therapist, and the speech and language pathologist.[145] Teacher Haws left her position shortly after S.C. enrolled at Warwick.

*The District provides a progress report for S.C. in December 2021.*

The parties did not adduce evidence of progress monitoring for the fall of the 2021-2022 school year. The District updated progress monitoring on six of S.C.'s ten IEP goals in December 2021.[146] S.C. showed some degree of progress on the manding, following one-step directions, echoics/vocalizations, visual-motor/fine motor skills, and addition and subtraction goals.[147] S.C. "mastered" his reading comprehension goal.[148] S.C. remained "not proficient" in manding, following one-step directions, and following two-component (noun-verb) directions.[149] He remained partially proficient in his visual-motor and self-care goal.[150]

The District's progress report lacks data for S.C.'s goals in functional communication, performing motor actions, following "noun-verb" directions (e.g., "show me the marker"), and speech intelligibility.[151] Two of these goals—performing motor actions and echoics/vocalizations—had been "mastered" since June 2021 and should have been updated with new goals.[152] The goal for following "noun-verb" directions remained on hold.[153] Parent testified about the difficulties they encountered trying to gauge S.C.'s progress in kindergarten, explaining "[S.C.] cannot talk.  His classmates cannot talk…We are completely reliant on the adult to tell us how his day was.  It's not like we get concerns from the child, from the student himself."[154]

*S.C.'s testing before starting at Warwick.*

A teacher in Warwick's autistic support classroom, Ms. Lewis, completed the Milestones Assessment for S.C. before he enrolled in the Warwick District school.[155] The Hempfield School District had not completed the assessment for S.C. since November 2020 despite their practice of testing students every Spring.[156] Warwick Teacher Lewis gave S.C. a score of 59 in December 2021 as compared to his November 2020 score of 63.[157] Warwick Teacher Lewis noted the slight regression could be "due to lack of instructional control on the teacher end as well as some areas could not be observed during the one hour assessment (group skills, some of the social interactions

and [S.C.] would not complete any writing activities),” or the lack of S.C. being able to complete the material in a different setting.[158] S.C. eloped a couple of times and tried to throw the writing material off the table during the Assessment.[159]

Warwick Teacher Lewis completed the Milestones Assessment in only one hour.[160] Hempfield Autism Coach Frederick would not trust this score or put weight in it because she does not know how the Milestones Assessment could be completed in such a short period of time.[161] Hempfield Autism Coach Frederick swore the Milestones Assessment can take weeks to administer, especially if a student has poor instructional control like S.C.[162] Warwick Assistant Superintendent Melanie Calendar offered a different view, estimating it takes “two hours to three hours” to complete the Milestones Assessment and it is usually administered “over multiple sessions.”[163] Warwick Assistant Superintendent Calendar also noted Warwick Teacher Lewis was “very proficient” in administering the Milestones Assessment.[164]

### Warwick convenes IEP meeting for S.C. in December 2021.

The Parents met with a new IEP team at Warwick in mid-December 2021.[165] Warwick Teacher Lewis observed S.C. had “strong prior instruction as his ‘ready hands’ is incredible.”[166] Warwick’s speech therapist wrote in the December 2021 IEP S.C. “was very verbal, producing both spontaneous speech and imitating words that were said to him. His imitation skills were strong[.]”[167] Warwick Teacher Lewis and the speech therapist could understand most of what S.C. said although “some words were quiet.”[168]

The December 2021 IEP (including revisions in the winter/spring 2022) contained seven goals, one each in mathematics (S.C. will pass the end of unit mastery test with 80% or higher in areas of number identification, identifying sets of objects, comparing numbers, and understanding “plus 1” math problems), visual-motor/fine motor skills and self-care tasks (writing, cutting, and “functional vocational” skills), reading comprehension (answering “who, what, where, when,

why" questions after reading new passages), speech intelligibility (produce different types of functional words), tacting (identify body parts and actions when prompted), listener response (when presented with a phrase such as "point to, touch, give," S.C. will respond with the correct action), and manding (requesting items or activities with vocal language).[169] S.C. would spend approximately 78% of the school day in special education settings, including an autistic support classroom.[170]

Warwick proposed to continue several of the modifications S.C. received in the Hempfield School District, including speech and language therapy, occupational therapy, a daily communication log, a pair teaching environment, errorless teaching procedures, and the use of reinforcers.[171] Warwick added a number of additional specially designed instructions to S.C.'s IEP including Social Emotional Academic Development, a program where S.C. and the other children in the classroom receive eighty minutes per month of direct social skills instruction with a counselor or psychologist.[172] The Warwick IEP team also added detailed behavior protocols based on their observations of S.C. during the Milestones Assessment. For example, if S.C. engages in "problem behavior," classroom staff will repeat demands in a neutral voice until S.C. cooperates and refrain from direct eye contact or dialogue with S.C. until the problem behavior ceases.[173]

The December 2021 IEP did not provide S.C. a personal care assistant or training to classroom aides in verbal behavior programming. The Warwick IEP team also removed the toileting program from the December 2021 IEP because Parents told Warwick they would be seeking support from outside agencies for this service.[174] A Parent confirmed they decided to seek outside support because he had made "no progress" in toilet training during his time at the Hempfield School District.[175]

### S.C. begins schooling at Warwick in December 2021.

S.C. started in the autism support classroom at Warwick on December 13, 2021.[176]

The Warwick autistic support classroom had seven to eight students in the class, Warwick Teacher Lewis, and three classroom aides.[177] The autistic support classroom at Warwick also focused on verbal behavior programming.[178] The classroom utilized small group and individualized instruction.[179] S.C. participated with his regular education peers for Social Emotional Academic Development class, reading, recess, and lunch.[180]

Warwick also struggled with staffing shortages.[181] There were times when other administrators or student services staff had to substitute for classroom aides in Warwick's autistic support classroom.[182]

### The Warwick IEP team convenes in January 2022.

The Warwick IEP team met to discuss S.C.'s plan on January 19, 2022.[183] The Parents expressed concern with S.C.'s progress in the general education setting at Warwick because he had never been included in general education setting in the Hempfield School District.

Warwick Teacher Lewis reported S.C. was doing well and making progress on his goals.[184] He learned new sight words, labeled 335 different pictures of items and mastered one body part and one action for his tacting goal, and mastered his motor imitation goal.[185] S.C. mastered second grade level sight words and was ready to learn third grade level sight words.[186]

The Warwick IEP team removed the motor imitation goal from S.C.'s IEP. They also revised the tacting goal to focus on teaching body parts and actions.[187]

### The Warwick IEP team convenes in February 2022.

The Warwick IEP team met again in February 2022 to discuss extended school year services for S.C.[188] S.C. did not qualify for extended occupational therapy services, but he still qualified for academic and speech and language services at Warwick for summer 2022.[189]

### *The Warwick IEP Team adds a toilet training program in April 2022.*

The Warwick IEP team added a toilet-training program to S.C.'s IEP in April 2022.[190] A Parent swore the Warwick IEP team had not added this program to S.C.'s December 2021 IEP because the Parents told Warwick they were seeking support from outside agencies to assist with toilet training.[191] Parents decided to add this goal back in April 2022 and put the outside toilet training services on hold after Warwick Teacher Lewis told them she was very skilled in toilet training.[192] Parent swore S.C. was partially toilet trained within three weeks of Warwick adding this program to his IEP.[193]

### *Progress monitoring at the end of the 2021-2022 school year.*

Warwick issued a progress report for S.C. at the end of the 2021-2022 school year.[194] Parents and the Hempfield District dispute S.C.'s progress at Warwick. Parents contend he made significant progress and they "felt like he was more responsive, talking more" and "doing wonderful things with sight words."[195] The Hempfield District maintains S.C. made "little progress" and regressed in the number of two-syllable and three-syllable words he could say.[196] The District also maintains S.C. regressed at Warwick in occupational goals he had mastered when he was previously enrolled in the District.[197]

The Warwick progress report shows S.C. made progress on his goals in math (passing three unit mastery tests with a score of 80% or higher), visual motor/fine-motor (improving writing, cutting, and functional vocational skills with 75-100% accuracy), reading comprehension (answering basic who, what, where, when, why questions about a story but S.C. did not approach the 80% accuracy goal), speech intelligibility (mastering more two-syllable words and other word patterns), tacting (identifying twenty-three different actions and fifteen different body parts), listener response (following directions for forty-six different listener response actions), and manding (requesting twenty-three different items or activities).[198]

Warwick notified Parents near the end of the 2021-2022 school year they could no longer accommodate S.C.'s out-of-district placement due to increased enrollment in the autistic support classroom for the 2022-2023 school year.[199] Assistant Superintendent Calendar did not work with the Parents directly until the end of S.C.'s time at Warwick when she had to notify Parents Warwick lacked space for S.C. She testified people "loved this young man" and people came to her "campaigning to try to keep him" in the school for longer.[200] Parents considered their options and decided to return to Hempfield District.[201]

### S.C. returns to Hempfield District for 2022-2023 school year.

S.C. returned to Hempfield District for second grade in the 2022-2023 school year. Hempfield Autism Coach Frederick swore S.C. returned to the District not fully toilet trained because he still required a toilet training schedule but he could independently use the bathroom which was "a big deal."[202]

### Parents seek a due process hearing in November 2022.

Parents filed a due process administrative complaint on November 16, 2022 alleging the District failed to implement programming designed to provide a free, appropriate public education to S.C. under the Individuals with Disabilities Education Act.[203] Parents sought (1) compensatory education from November 16, 2020 through December 12, 2021 (when S.C. withdrew from the District and enrolled at Warwick); (2) reimbursement for tuition and costs of unilateral placement of S.C. at Warwick from December 13, 2021 through the end of S.C.'s first grade year; and (3) reimbursement for attorney's fees.[204]

Hearing Officer Michael J. McElligott, Esquire presided over a three-day virtual due process hearing beginning on January 8, 2023 and concluding March 8-9, 2023. Hearing Officer McElligott evaluated the credibility of testimony from seven witnesses including one of S.C.'s Parents, District personnel, and Warwick's Assistant Superintendent.[205]

Hearing Officer McElligott found "[a]ll witnesses testified credibly" and he accorded "a degree of weight" to each witness's testimony.[206] Hearing Officer McElligott concluded the two classroom aides' testimony "cannot be fully credited" because "instruction and classroom conditions were not as dire as portrayed in their testimony."[207] He continued the testimony of Autism Coach Frederick cannot be fully credited either because "instruction and classroom conditions were clearly negatively impacted by deficiencies of classroom staffing."[208] Hearing Officer McElligott concluded conditions related to staffing in the kindergarten classroom "lies somewhere between the two positions." Hearing Officer McElligott credited Director Galen's testimony no one told her about daily staffing issues.[209]

Hearing Officer McElligott issued his decision on April 25, 2023 finding: (1) the District provided S.C. a free appropriate public education for the 2020-2021 school year (kindergarten); (2) the District did not provide S.C. a free appropriate public education from August 2021 through December 2021 (first grade); (3) S.C. is entitled to sixty-five hours of compensatory education attributable to the period August 2021 through mid-December 2021 when he withdrew from the District; and (4) Parents are entitled to reimbursement of tuition for the period December 2021 through June 2022 while S.C. attended Warwick.[210] Hearing Officer McElligott addressed the Section 504 of the Rehabilitation Act claim on the same grounds as the claims under the Individuals with Disabilities Education Act and did not provide a separate analysis for this claim.

### *The District and Parents sue each other.*

The District sued S.C. and the Parents seeking to overturn the portion of Hearing Officer McElligott's decision finding the District denied S.C. a free appropriate public education for the 2021-2022 (first grade) school year and awarding the Parents sixty-five hours of compensatory education for the period from August 2021 to December 2021. The District also seeks to overturn the Hearing Officer's award of tuition reimbursement to the Parents for S.C.'s time at Warwick.

22

The Parents seek to overturn the portion of Hearing Officer McElligott's decision finding the District provided S.C. a free appropriate public education for the 2020-2021 school year (kindergarten). Parents sue the District seeking full days of compensatory education for the 2020-2021 school year and the period of August 2021 through December 2021, and attorney's fees and costs.

## II.   Analysis

The District, S.C., and Parents ask us resolve issues arising from Hearing Officer McElligott's findings as to a free and appropriate public education for S.C. during S.C.'s 2020-2021 kindergarten year and his 2021-2022 first grade year. We will address the issues in chronological order starting with the kindergarten year. The parties' dispute largely centers around whether the District sufficiently staffed the autistic support classroom and provided S.C. sufficient instruction and services to enable him to receive a meaningful education.

### A.   We reverse Hearing Officer McElligott's FAPE decision as to the 2020-2021 school year and affirm his FAPE decision for the 2021-2022 school year except using the correct legal standard to assess the claims.

We first address Hearing Officer McElligott's findings as to whether the District provided S.C. a free appropriate public education for the 2020-2021 and 2021-2022 school years.

The District moves for judgment on the administrative record, challenging Hearing Officer McElligott's decision as to full tuition reimbursement and sixty-five hours compensatory education for the 2021-2022 school year arguing: (1) the Hearing Officer erred in finding the provision of a free appropriate public education depends entirely on the rate of student progress, (2) the Hearing Officer ignored objective evidence regarding S.C.'s actual progress during the 2021-2022 school year and erroneously faulted the District for allegedly deficient progress monitoring when the IEP called for progress monitoring on a trimester basis, (3) the Hearing Officer erred in ordering an award of public school tuition; and (4) the Hearing Officer's award of

23

public school tuition and compensatory education is punitive and excessive. Parents respond the Hearing Officer correctly concluded the District denied S.C. a free appropriate public education in the 2021-2022 school year based on evidence the District fell wholly short of providing S.C.'s IEP services. Parents argue the Hearing Officer correctly awarded tuition reimbursement because (1) the Individuals with Disabilities Education Act does not specifically preclude tuition reimbursement for placement in another public school, and (2) Warwick is an appropriate placement.

Parents also move for judgment on the administrative record, primarily challenging Hearing Officer McElligott's finding the District did not deny S.C. a free appropriate public education in his 2020-2021 kindergarten school year. Parents argue: (1) the Hearing Officer erred in concluding the District provided S.C. a free appropriate public education during the 2020-2021 school year because the record establishes S.C. did not make reasonable progress commensurate with his ability due to lack of staff support; (2) the Hearing Officer correctly concluded the District denied S.C. a free appropriate public education during the 2021-2022 school year but erred in awarding only one hour of compensatory education per day from August 2021 to mid-December 2021 (totaling sixty-five hours); (3) S.C. is entitled to full days of compensatory education from November 16, 2020 to December 2021; (4) the Hearing Officer correctly awarded tuition reimbursement for S.C.'s placement at Warwick; and (4) Parents are entitled to attorney's fees and costs as prevailing parties. The District responds: (1) the testimony of the two classroom aides' should not be credited or used as the basis for finding S.C.'s IEP was not implemented with fidelity, and without the classroom aides' testimony, Parents fail to meet their burden of proving the District did not implement S.C.'s IEPs with fidelity during the kindergarten year; (2) public school tuition is not an available remedy under the Act, (3) the Hearing Officer's award of sixty-five hours of

compensatory education is arbitrary and should be reversed; and, (4) Parents are not a prevailing party.

The Parties agree the Hearing Officer erred in three ways. The Parties agree the Hearing Officer erred in focusing exclusively on S.C.'s academic progress in his analysis because whether S.C. made any progress is not the ultimate determinant of whether the District provided S.C. a free appropriate public education.[211] The Parties seem to agree the Hearing Officer made incongruent findings the District provided S.C. a free appropriate public education in kindergarten but denied S.C. a free appropriate public education in first grade given the factual circumstances—staffing issues, IEP, progress—changed very little between S.C.'s kindergarten and first grade school years.[212] The Parties also agree the Hearing Officer's award of sixty-five hours of compensatory education was arbitrary.[213]

We apply a modified d*e novo* review giving where due weight to Hearing Officer McElligott's fact findings when considering the parties' appeals from Hearing Officer McElligott's decision.[214] "This means a district court must make its own findings of facts by a preponderance of the evidence while also giving 'due weight' to the factual findings of the Special Education Hearing Officer."[215] Under this standard, if we depart from Hearing Officer McElligott's findings of fact, we must explain why since the factual findings are considered prima facie correct.[216]

We afford Hearing Officer McElligott's determinations "due special weight" when he evaluates live testimony and determines one witness is more credible than another witness.[217] We must accept Hearing Officer McElligott's credibility determinations unless the non-testimonial, extrinsic evidence in the record justifies a contrary conclusion.[218] We cannot substitute our own notions of sound educational policy for those of local school authorities.[219]

If we hear additional evidence, we are "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act."[220] We review Hearing Officer McElligott's legal conclusions under the *de novo* standard.[221]

The party challenging Officer McElligott's decision bears the "burden of persuasion . . . as to each claim challenged."[222] We must base our decision on the preponderance of the evidence in evaluating the arguments of the party challenging Hearing Officer McElligott's findings.[223]

We studied the administrative record. We conclude Hearing Officer McElligott erred in finding the District provided S.C. a free appropriate public education for the 2020-2021 school year and grant the Parents' motion to reverse his findings for the 2020-2021 year. Hearing Officer McElligott correctly found the District denied S.C. a free appropriate public education for the 2021-2022 school year but applied the wrong law in reaching his conclusion. Applying the correct law, we find the District failed to provide S.C. a free appropriate public education from August 2021 to December 2021 by failing to implement substantial portions of his IEP due to staffing issues. Hearing Officer McElligott did not err in awarding tuition reimbursement for the time S.C. spent at Warwick during the 2021-2022 school year. Parents are entitled to attorney's fees as prevailing parties but have not adduced evidence on the issue. We grant Parents leave to file a fee petition. We remand to the Hearing Officer to determine, consistent with his expertise and this memorandum, the amount of compensatory education to which S.C. is entitled between November 16, 2020 and December 12, 2021.

## 1.    Congress sets our scope of review.[224]

Congress enacted the IDEA to "protect[ ] the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot

provide."[225] States receiving federal education funding must make available a free and appropriate public education to all children with disabilities residing within their borders.[226] A free and appropriate public education includes both "special education" and "related services."[227] The obligation to provide a free and appropriate public education is substantially the same under Section 504 of the Rehabilitation Act of 1973 and the American with Disabilities Act.[228]

The District can meet its free appropriate public education obligation through the development and implementation of an IEP, which is the "centerpiece of the statute's education delivery system for disabled children."[229] An IEP is "the means by which special education and related services are 'tailored to the unique needs' of a particular child."[230] An IEP requires a specific statement of S.C.'s present abilities, goals for improvement of S.C.'s abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services.[231] The IEP must be "reasonably calculated to enable [S.C.] to make progress appropriate in light of [his] circumstances."[232] "The District is required to review each child's IEP at least annually to determine whether the child is reaching the stated goals, and the IEP team is to revise the IEP to address lack of progress and make necessary changes arising from reevaluation of the child and parental input."[233]

"The ultimate question in every case is whether a school has provided a free appropriate public education."[234] But there are two ways a school can fail to do so: (1) by failing to comply with the Act's procedures for formulating an IEP or failing to include appropriate provisions in a student's IEP based on the student's needs ("content cases"), or (2) by failing to implement the provisions of an IEP ("implementation cases").[235] "Content cases involve a prospective comparison of the IEP as written to the substantive standard that the IDEA guarantees; implementation cases, by contrast, involve a retrospective comparison between the education as delivered and the plan on paper."[236] "In implementation cases, reviewing courts can presume that

27

an unchallenged IEP, if adequately implemented, would offer a free appropriate public education ... and a court is left only to determine whether the school delivered an education 'in conformity with' the presumptively valid IEP."[237]

"To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the disabled child was denied a meaningful educational benefit."[238] "Flexibility to implement an IEP is maintained, yet the school district is accountable for 'confer[ring] some educational benefit upon the handicapped child,' as required by the IDEA."[239] The state, through the District, "is not required to maximize the potential of every handicapped child," but "it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child."[240] "[A] district court must consider the intellectual potential of the individual student when making its decision."[241]

The District may be responsible for reimbursing Parents for the private school costs if the District cannot provide a free and appropriate public education to S.C. but a private school could provide a free and appropriate public education.[242]

## 2. Hearing Officer McElligott erred in finding the District provided S.C. with a free appropriate public education for the 2020-2021 (kindergarten) year.

Hearing Officer McElligott found the District provided S.C. with a free and appropriate public education for the 2020-2021 (kindergarten) school year. Whether the District fulfilled its free appropriate public education obligation is a question of fact.[243] Because Parents challenge the Hearing Officer's decision, they bear the burden of showing the District "failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the disabled child was denied a meaningful educational benefit." [244] We find the District denied S.C. a free and appropriate public education during the 2020-2021 (kindergarten) school year.

28

Parents bring an IEP implementation challenge. They do not challenge the procedures followed to develop the IEP. They also do not challenge the appropriateness of S.C.'s IEP or whether the IEP is "reasonably calculated to enable [S.C.] to make progress appropriate in light of [his] circumstances."[245] Parents instead argue the District denied S.C. a FAPE because it did not implement certain provisions of S.C.'s programs due to staffing shortages and a lack of consistent programming. The Hearing Officer acknowledged staffing issues in the classroom during kindergarten, but he concluded the District did not deny S.C. a free appropriate public education because S.C. "gained the benefit of significant learning in the 2020-2021 school year."[246] We review Hearing Officer McElligott's fact findings under the "due weight" standard and conduct a plenary review of the Hearing Officer's conclusions of law.[247]

Hearing Officer McElligott found, and we agree, the record establishes the District experienced staffing issues in the autistic support classroom during S.C.'s 2020-2021 kindergarten year. After the regular classroom teacher went on maternity leave in October 2020, the District did not hire a long-term substitute teacher until May 2021.[248] Autism Coach Frederick filled the role of classroom teacher but she could be present in the classroom all day or every day because she still had to fulfill her role as autistic support coach in other classrooms.[249] Between October 2020 and May 2021, the District staffed the classroom with multiple day-to-day substitute teachers.[250] Autism Coach Frederick swore on average she taught in the classroom two to three days a week because the District could not find a substitute every day.[251] The two classroom aides testified one of the classroom aides missed "at least 25" days, or "a month to six weeks," of the school year.[252]

Officer McElligott concluded "regardless of how [the staffing issues] played out, [S.C.] gained the benefit of significant learning in the 2020-2021 school year" as evidenced by his progress "in almost all goal areas."[253] The Hearing Officer explained "it is the student's progress, as evidenced by the documentary progress monitoring, which is the dispositive evidence."[254]

The Parties argue, and we agree, the Hearing Officer's findings are invalid to the extent he relied exclusively on evidence of S.C.'s progress in determining whether the District provided S.C. a free appropriate public education.

Progress is not dispositive evidence the District provided S.C. a free appropriate public education under well-established case law.[255] We are guided by our colleague's reasoning in *Colonial School District v. G.K.*[256] Judge Hart reviewed Hearing Officer McElligott's finding the Colonial School District failed to provide student G.K. a free appropriate public education. Colonial School District argued Officer McElligott erred in finding the G.K.'s IEP was not appropriate solely by evaluating the student's progress (or lack thereof) under the IEP. Judge Hart agreed, finding the Supreme Court instructs us the Act does not "guarantee any particular level of education."[257] Judge Hart found Hearing Officer McElligott "erred in explicitly basing his grant of compensatory education on his finding that 'on certain goals ... the student did not make progress.'"[258]

Judge Hart found progress is not dispositive in the context of IEP content cases. The same is true for implementation cases.[259] To prevail on their failure-to-implement claim, Parents must show the Hempfield District School "failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure," and thus denied S.C. "a meaningful educational benefit."[260] "A child's actual educational progress (or lack thereof) can be evidence of the materiality of an implementation failure—but it is not dispositive."[261] "It is merely one piece of evidence courts may use in assessing whether a school failed to implement substantial or significant provisions of the IEP."[262]

We find Officer McElligott erred as a matter of law by focusing his analysis exclusively on S.C.'s progress over the kindergarten year.[263] Progress is not dispositive in either content cases or implementation cases. But Hearing Officer McElligott's fact findings primarily related to S.C.'s

progress. While he made findings as to the state of the autistic support classroom as a whole, he did not make findings related to S.C.'s specific programming and he did not ascertain which of the services in S.C.'s IEP, if any, the District did not deliver. We cannot determine whether the District denied S.C. a free appropriate public education in an implementation case without first making these fact findings.

We now apply the correct legal standard to the evidence in the record, giving due weight to Hearing Officer McElligott's findings of fact. The first step in a failure-to-implement analysis is to identify which IEP services, if any, the District did not deliver.[264] The next step is to determine whether those services constitute "substantial or significant" provisions of the IEP.[265] We start by focusing on "the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld."[266] "That means that courts must consider implementation failures both quantitatively and qualitatively to determine *how much* was withheld and *how important* the withheld services were in view of the IEP as a whole."[267]

Parents argue the District failed to implement S.C.'s IEPs during the 2020-2021 school year because the District failed to consistently implement S.C.'s programming on a daily basis, especially the toilet-training program. The relevant IEPs for S.C.'s kindergarten year are S.C.'s June 2020 IEP (as revised during the October 2020 IEP meeting) and S.C.'s January 2021 IEP. Both the June 2020 IEP and the January 2021 IEP provide S.C. will receive the following underline programming: specially-designed instruction geared toward improving S.C.'s activities of daily living, including providing S.C. support with toileting readiness skills by having staff accompany him to the toilet at least once every thirty minutes; a personal care assistant for five-and-a-half hours per day; use of behavior protocols to increase safety awareness and compliance; individualized and small group instruction; a pair teaching environment; errorless teaching procedures; and fast-paced instruction.

The record establishes the District did not provide S.C. regular programming during the kindergarten school year due to staffing issues. The autistic support classroom had untrained substitute teachers two to three days per week during the time period November 2020 through the end of May 2021 when the District hired Teacher Haws. Substitute teachers did not deliver new programming but instead worked with the students on known skills.[268] Two to three days per week is a substantial period of time for students to be working on known skills. Although Autism Coach Frederick generally did not pair S.C. with substitute teachers (he stayed with the classroom aides because his program was more complex), the classroom aides swore they were often confused how to implement S.C.'s programming. And neither the substitute teachers nor the classroom aides had access to S.C.'s IEP—they relied on Autism Coach Frederick for guidance.[269] Neither the substitutes nor the paraprofessionals could carry out S.C.'s  IEP program consistently due to Autism Coach Frederick's absence in S.C.'s classroom.

 Both classroom aides testified there were days when they were unable to implement any of S.C.'s programs because they were so focused on trying to keep the kids in the classroom safe.[270] Classroom aide Hilton explained they "really could not do" S.C.'s toileting program once the regular classroom teacher left because it required S.C. to have one-to-one support staff take him to the bathroom every thirty minutes.[271] Classroom aide Dulio confirmed this testimony.[272] Autism Coach Frederick swore she did know the classroom aides could not carry out S.C.'s daily programming.

The Parties dispute the credibility of the classroom aides' testimony. Parents rely heavily on the testimony of the two classroom aides as "firsthand witnesses to the events in the classroom" during S.C.'s kindergarten year, noting "[t]hey are the only two witnesses who have no stake in the current dispute" because they no longer work for the District.[273] The District asks we not credit

32

"the testimony of two disgruntled former employees" because the Hearing Officer's determination one witness is more credible than another is entitled to "heightened deference."[274]

We agree we must generally accept Hearing Officer McElligott's credibility determinations. But contrary to the District's suggestion, the Hearing Officer did not find Autism Coach Frederick's testimony to be "more credible" than the aides' testimony. Hearing Officer McElligott found with respect to the "factual mosaic of conditions" in the kindergarten classroom, neither the aides' testimony ***nor the teacher's testimony*** could be "fully credited."[275] Hearing Officer McElligott found "the impact of those staffing issues on the student's learning lies somewhere between the aides' views that staffing seriously impeded instruction/services and the teacher/internal-coach's view that instruction/services were largely unaffected by staffing issues."[276]

Weighing Autism Coach Frederick and the aides' testimony equally but not fully crediting either as the Hearing Officer instructed, we conclude the record establishes, at a minimum, the District did not provide S.C. with consistent IEP programming during the kindergarten school year. Even if the classroom conditions are "not as dire" as the aides portrayed in their testimony, the fact remains S.C. did not receive daily services and supports provided in his IEP. Autism Coach Frederick claimed she was "not aware" about issues with S.C.'s daily programming, but she also admitted she was only in the classroom two to three days of week for a period of time. The two classroom aides swore staffing and implementation issues arose primarily when Autism Coach Frederick was *absent* from the classroom. Because Autism Coach Frederick was not regularly present in the autistic support classroom, she does not have significant knowledge regarding day-to-day implementation struggles, especially for the time period between October 2020 and March 2021 when she admits she was only in the classroom two to three days per week.[277]

The implementation failure is significant. The aides' testimony suggests S.C. did not receive proper programming for two to three days per week during the relevant period. The staffing disruptions and lack of consistency can be especially challenging for a child like S.C. who struggles with instructional control. The language in the IEP confirms the importance of consistent, repetitive daily programming: "[S.C.] is in need of specially designed instruction *throughout his school day*. Without these supports, [S.C.] would not be able to make appropriate progress."[278] S.C.'s IEP provided S.C. would receive his services, including errorless teaching procedures, assistance for self-care tasks, and support with toilet readiness skills, daily. The IEP provides teachers must measure S.C.'s progress daily for most of his goals. In recommending S.C. for extended school year services, the agreed IEP report notes S.C. "shows some regression when there are breaks in programming."[279]

The District's implementation failures are supported by the record showing S.C.'s lack of progress. Parents saw very little progress with toileting. While S.C. "mastered" his goal for verbalizations and performing motor actions by June 2021, progress on his remaining goals stalled.[280] The teacher marked S.C. "not proficient" on his goals for speech, manding, math, and following one-step directions from March through June 2021.[281] The teacher commented under his math progress report: "instructional control is weak, therefore performance is inconsistent and progress toward learning new skills is at a standstill."[282] The teacher placed S.C.'s IEP goal for following noun-verb directions "on hold" from March through December 2021 due to S.C.'s poor instructional control.[283] The teacher marked S.C. "partially proficient" in vocabulary and decoding in March 2021, but noted S.C.'s "performance is inconsistent and progress is slow."[284] The District neglected to even report on this goal in June 2021. And while the progress report notes S.C. "mastered" his goal for performing at least 30 new motor actions by June 2021, the teacher's comments section indicates he only demonstrated mastery of eighteen actions.[285]

The Hearing Officer erred in finding S.C. received the benefit of significant learning. The Hearing Officer concluded S.C. made "continued improvement in milestone achievement" because he scored a 38 on the Milestones in September 2020 and then a 63 only two months later in November 2020. But the relevant time period for our purposes is November 2020—after the regular classroom teacher went on leave—through December 2021 when S.C. withdrew from the District. S.C. scored a 59 in December 2021—suggesting he regressed slightly over the relevant time period. Classroom aides Hilton and Dulio both swore they noticed regression in S.C.'s skills and opined he could have made much more progress with proper support. The non-testimonial data included in the progress reports supports the classroom aides' testimony S.C. did not make reasonable educational progress commensurate with his ability.

We are not persuaded by the District's reliance on two decisions of our Court of Appeals and one decision of our colleague Judge McHugh in support of its argument it did not fail to implement S.C.'s IEP. These decisions do not assist the District; they instead highlight the relative deficiencies in Hempfield's implementing the IEP.

In *Melissa S. v. School District of Pittsburgh*, the parents of a child with Down Syndrome sued the Pittsburgh School District for failing to implement the child's IEP by failing to provide the child with an aide on certain occasions.[286] Judge Lancaster held the Pittsburgh School District did not deny the child a free appropriate public education because there was no evidence the staff ever left the child unattended.[287] On days when a personal aide could not be provided, the school notified the parent and told them to keep the child home for the day. Even if the school did leave the child unattended, the failure was not substantial or significant as it occurred "several" times at most.[288] Our Court of Appeals affirmed Judge Lancaster's decision the Pittsburgh School District did not deny the child a free appropriate public education based on this limited evidence.[289]

In *Fisher v. Stafford Township Board of Education*, a mother sued the Stafford Board of Education for failing to properly implement the IEP for her son with autism and a developmental disorder.[290] The IEP provided the student a personal trained aide for the full school day. The Board could not find a trained aide. The mother decided to keep her son out of school until they could find a trained aide. The mother found a qualified aide and convinced the Board to hire them. The qualified aide eventually resigned and the Board replaced her with other aides. The mother decided to supplement the aides' salaries using her own resources. The mother sought reimbursement for the payments she made to the son's aides on a theory the Board failed to properly implement the son's IEPs by failing to provide the son with a trained aide for a total of ten days.[291] Judge Wolfson decided the mother was not entitled to reimbursement for the amount she paid to supplement the aides' salaries because the Board's failure to provide the son an aide for a total of ten days was de minimis.[292] Our Court of Appeals affirmed.

The District also relies on the decision in *J.C. v. Upper Darby School District*, in which a mother sued the Upper Darby School District for failing to provide a personal care assistant to her son J.C., who had a hearing impairment.[293] Although J.C. did not have a diagnosis of autism spectrum disorder, the Upper Darby School District educated him in an autism support classroom based on his need for verbal programming. J.C. had a hearing support teacher who worked with him on American Sign Language individually each week.[294] J.C.'s IEP also provided him with a personal care assistant who would use basic nonverbal signs and provide sign language support to assist J.C. in understanding instruction. J.C. did not have a consistent personal care assistant in part because J.C. was frequently absent from school due to transportation issues.[295] Sometimes a personal care assistant was not available for the entire school day. Judge McHugh found even if the record evidenced periodic inconsistency in providing a personal care assistant to J.C., "nothing in the record convinces [him] that this prevented [the student] from receiving meaningful

educational benefits considering the individualized support he received through his autistic support teacher and teaching assistants."[296] Judge McHugh concluded the Upper Darby School District did not deny the child a free appropriate public education.

We are not persuaded by the District's reliance on these inapposite fact patterns. When the student in *J.C. v. Upper Darby School District* lacked a personal care assistant on just a few occasions, other members of the teaching team filled in to provide the student with individualized support. S.C.'s autistic support classroom lacked this safety net. The classroom aides and substitute teachers could not implement S.C.'s programming when Autism Coach Frederick could not be in the classroom for several days over several months. And unlike the schools in *Melissa S.* and *Fisher* and *J.C.*, the District's failure is not merely periodic. One aide estimated there were multiple days *per week* when teaching did not take place, although they would try to fit in forty-five minutes of instruction "here and there."[297] The other aide estimated they spent 75% of their days "just keeping kids safe, changing diapers and keeping them fed."[298] And unlike Judge McHugh in *J.C. v. Upper Darby School District*, we find evidence in the record shows the implementation failures prevented S.C. from receiving meaningful educational benefits.

We are guided instead by the Court of Appeals for the Fourth Circuit's analysis of an implementation claim with a more similar fact pattern presented in *Sumter Cty. Sch. Dist. 17 v. Heffernan*.[299] A student with autism received only 7.5-10 hours of the 15 hours of applied behavioral therapy instruction required by his IEP.[300] The record showed the lead teacher and the aides did not have a good understanding of the terminology or techniques used in applied behavioral therapy. The Sumter School District argued they did not materially fail to implement the IEP because the student still received some educational benefit during the school year.[301] Judge Anderson accepted the hearing officer's factual findings but determined "the evidence considered as a whole pointed to a different legal conclusion."[302] Judge Anderson credited the testimony of

an applied behavior therapist who worked in the classroom who explained (1) many of the student's problems were caused by the failure of the lead teacher and aides to properly understand and implement the ABA teaching techniques, and (2) it took months of working with the student to cure the problems caused by improper implementation of his program.[303] The court of appeals affirmed Judge Anderson's finding the missing hours, in combination with the school's failure to utilize the teaching techniques specified in the IEP, amounted to a failure to implement the student's IEP.[304]

The record shows S.C. struggled academically because he received inadequate programming and only a fraction of the services detailed in his IEP, much like the student in *Sumter*. We follow Judge McHugh's lead in considering the testimony of the individuals actually present in the classroom on a daily basis—the two classroom aides.  Both classroom aides testified S.C. is "very smart" but the lack of consistent teacher support impacted S.C.'s progress.[305] One of the classroom aides explained her students "need that repetitive teaching in order to retain it" and if they cannot provide programming for the appropriate amount of time each day then the students regress.[306] The record supports this observation. The Parents testified as of November 2021, they still struggled with toilet training S.C. and were not seeing "any success" with the District's program implementation.[307]

The evidence establishes the District did not consistently provide S.C. with the IEP supports and services he required to receive a free appropriate public education, and the implementation failures deprived S.C. of a meaningful education benefit.[308]

### 3.  Hearing Officer McElligott properly found the District did not provide S.C. with a free appropriate public education for the 2021-2022 school year.

Hearing Officer McElligott found the Hempfield School District did not provide S.C. with a free and appropriate public education for the 2021-2022 (first grade) school year. Whether the

District fulfilled its free and appropriate public education obligation is a question of fact.[309] Because the District challenges the Hearing Officer's decision, it bears the burden of showing it did not fail to implement substantial or significant provisions of the IEP or deny S.C. a meaningful educational benefit.[310] We find the District denied S.C. a free and appropriate public education to S.C. during the 2021-2022 school year giving "due weight" to the Hearing Officer findings under the modified *de novo* standard.

Hearing Officer McElligott found and we agree the record establishes the autistic support classroom's staffing issues during the 2020-2021 school year persisted into the 2021-2022 school year. The classroom had one fewer classroom aide than the year before despite having the same number of students. S.C. went without a speech therapist for fourteen days. Two of the classroom aides left in November 2021 because they were frustrated the children in the classroom were not getting enough educational support.[311] Teacher Haws confirmed there was only one teacher and one paraprofessional in the classroom at the time the parents decided to enroll S.C. in Warwick, with only intermittent support from other staff.[312] The Hearing Officer further concluded the District did not complete progress monitoring during the fall of 2021.

While Hearing Officer McElligott acknowledged the staffing issues, he found "it is the progress monitoring—or, more precisely, the lack of progress monitoring—that tells the tale and is the grounds for finding that the student was denied FAPE in the fall of 2021."[313]

We again find Officer McElligott erred as a matter of law in his analysis by focusing exclusively on progress or progress monitoring. Parents assert an implementation claim under the Act. We now apply the correct legal standard to the evidence in the record, giving due weight to the Hearing Officer's findings of fact.

The relevant IEP is the January 2021 IEP, which included daily specially-designed instruction geared toward improving S.C.'s activities of daily living, including providing S.C.

support with toileting readiness skills by having staff accompany him to the toilet at least once every thirty minutes; a personal care assistant for five-and-a-half hours per day; the use of behavior protocols to increase safety awareness and compliance; individualized and small group instruction; a pair teaching environment; errorless teaching procedures; and fast-paced instruction.

The record establishes the District did not provide S.C. regular programming during the first-grade year due to staffing issues. Teacher Haws admitted staffing issues negatively impacted her ability to implement S.C.'s IEP goals with fidelity.[314] Teacher Haws explained less staff meant each staff member had to instruct a larger group of children.[315] Teacher Haws swore she had a student who displayed aggression in the classroom requiring them to evacuate the other students for safety purposes.[316] When a student displayed an unsafe behavior, it often required two adults to address the situation and one adult to keep the remaining children safe—further reducing the amount of precious learning time for the students.[317] Teacher Haws admitted she specifically struggled to perform errorless teaching sessions, use fast-paced instruction, and provide S.C. with regular toileting support as required by his IEP.[318] The classroom aides testified they also struggled to consistently implement S.C.'s programs due to staffing shortages.[319]

The implementation failure during the first grade is significant. S.C.'s IEP repeatedly provides S.C. must receive daily services. One classroom aide testified there were times when they were just "babysitting" and "learning wasn't happening."[320] Another aide testified there were "hours missed everyday" dealing with behavioral issues.[321] The District's implementation failures are also supported by the December 2021 progress data. While S.C. "mastered" his vocabulary and echoics goals, S.C. remained "not proficient" in many of his IEP goals including manding, following one-step directions, and math.[322] The goal for following two-step directions remained on hold.[323] S.C. remained partially proficient in his visual-motor and self-care goal.[324] The progress report lacks any December 2021 data for S.C.'s goals in functional communication,

performing motor actions, and speech intelligibility.[325] Both classroom aides, who were responsible for tracking and assessing S.C.'s progress on a daily basis, testified S.C. regressed in his skills during first grade.[326]

The District argues S.C. made progress under the January 2021 IEP but provides little support for its position. The District relies on classroom aide Hilton's testimony in support of its argument S.C. "made so much progress with toileting that he was able to sign when he needed to go to the bathroom."[327] The District's characterization of classroom aide Hilton's testimony is inaccurate. Classroom aide Hilton swore S.C. had a "good day" where he was able to sign to go to the bathroom but she thought toileting "would have gone much better had we had help" and "he could have been much further ahead" with the proper supports.[328]

The District, and the Hearing Officer, repeatedly did not consider S.C.'s progress in light of his potential.[329] Classroom aide Hilton observed S.C. is "brilliant," "super smart," "the smartest kiddo in there," and "picked things up really fast."[330] Classroom aide Dulio observed S.C. "is a very smart kid" who "could have progressed a lot more than he did."[331] Classroom aide Dulio found S.C.'s regression "concerning" for "as smart as a kid he was and how quickly he picked up stuff."[332] Autism Coach Frederick referred to him as "a smart little whip!"[333] The fact S.C. did not make progress commensurate with his abilities is supported by how fast he progressed between September 2020 and November 2020—when he benefited from Teacher Yoder's instruction—and his regression from November 2020 to December 2021—when he did not receive consistent programming because of staffing shortages and inadequate supports.

The District places great emphasis on the Parents' view being "very pleased" with S.C.'s progress. The record suggests otherwise. In July 2021, Parent reached out to Autism Coach Frederick expressing her concern with S.C.'s latest progress reports and noting she has seen a regression in speech at home.[334] Parent reached out to staff in the District in July 2021 and again

in November 2021 explaining they have not seen progress with potty training and seeking help from outside agencies.[335] Parents only learned of the staffing issues in the classroom in Fall 2021 after speaking with fellow parents and the classroom aides who expressed their concerns. Parents emailed Director Galen requesting she visit the classroom and expressing concerns the classroom is "chronically understaffed, with incorrect student to teacher ratios," they received reports faculty "are primarily focused on keeping the children safe and fed," and they are concerned about "the teacher's ability right now to meet educational requirements."[336] Director Galen told Parents the speech therapist was on maternity leave only after they specifically inquired.[337] Parents asked for a meeting and the District met to discuss Parents' concerns about staffing and review S.C.'s progress in November 2021.[338] Parents discussed a number of options for addressing the problem with the District but left the meeting feeling as though the District did not have a plan to remedy the situation.[339] Parents learned in early December of classroom aides Dulio's and Hilton's departure only after contacting Teacher Haws for a list of teachers to whom they could send Christmas cards.[340]

The District also cites to the fact Teacher Haws implemented the students' IEPs every day as evidence S.C. received meaningful educational benefit. The question is not whether Teacher Haws implemented the IEPs, but rather the *extent* to which she implemented them. The District mischaracterizes the evidence on this point, claiming first Teacher Haws said staffing shortages did not impede the fidelity of IEP implementation.[341] Teacher Haws said precisely the opposite. When asked whether she thought the staffing shortages impacted her ability to implement S.C.'s IEP, she responded: "Yes, definitely with fidelity. With fewer staff in the room, it required grouping, so it didn't allow for things to be done with fidelity."[342]

The evidence establishes the District did not consistently provide S.C. with the IEP supports and services he required to receive a free appropriate public education. We conclude the

implementation failures deprived S.C. of a meaningful education benefit in first grade in the Hempfield School District.[343]

> **B. We remand consideration of the award of compensatory education for the 2020-2021 and 2021-2022 school years to the expertise of the Hearing Officer to make non-arbitrary findings consistent with this Memorandum.**

Congress empowers us to "fashion an appropriate remedy to cure the deprivation" of S.C.'s right to receive a free appropriate public education.[344] S.C. is "entitled to be made whole with nothing less than a 'complete' remedy."[345] "Compensatory education is an equitable remedy in which a child is given additional education hours to make up for deficient hours of schooling when not provided a FAPE."[346] Compensatory education is an appropriate remedy when the District knows or should know a child's special education program is not appropriate and fails to remedy the deficiencies.[347] "Longstanding Third Circuit precedent demonstrates that this type of award is designed to compensate the child for the period of time of the deprivation of appropriate educational services, while excluding the time reasonably required for a school district to correct the deficiency."[348]

After concluding the District denied S.C. a free appropriate public education, Hearing Officer McElligott awarded S.C. sixty-five hours of compensatory education for the District's deficient schooling in the 2021-2022 school year.[349] The Hearing Officer estimated approximately sixty-five days of schooling occurred between late August 2021 when S.C. started in first grade and mid-December 2021 when he withdrew from the District. He awarded one hour per day of deficient schooling, reasoning despite the staffing issues and progress monitoring "there was education unfolding over the fall of 2021."[350]

Parents ask us to award six additional hours of compensatory education for each day of schooling from November 16, 2020 through the conclusion of the 2020-2021 school year.[351] The District argues there is no evidence of an educational deprivation for which compensatory

education is owed. We already determined the District deprived S.C. of a meaningful education benefit from November 2020 through December 2021.

"Determining the amount of a compensatory education award requires a fact-specific inquiry."[352] "The award should 'match the quantity of services improperly withheld throughout that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies.'"[353] In instances where "the denial of FAPE creates a harm that permeates the entirety of a student's school day," "full days of compensatory education (meaning one hour of compensatory education for each hour that school was in session) may be warranted[.]"[354]

Both parties argue the Hearing Officer's award of compensatory education for the 2021-2022 school year is arbitrary.[355] We agree this award is arbitrary as the Hearing Officer did not explain how one hour per day equitably put S.C. back in the position he was in before the deficient schooling, nor did he make any factual findings to support this quantitative conclusion. We also find Hearing Officer McElligott based the award on an erroneous application of the law. By focusing exclusively on supposed deficiencies in progress monitoring, the Hearing Officer failed to consider the full spectrum of services improperly withheld, including toileting programming, individualized instruction, errorless teaching procedures, and fast-paced instruction. The Hearing Officer must assess *quantitatively* the amount of services S.C. missed consistent with this opinion. The Hearing Officer must also consider whether to exclude from its calculation the amount of time reasonably required for the District to correct the deficiencies.

We find because Hearing Officer McElligott erred in determining the District provided S.C. an appropriate education for the 2020-2021 school year, he also erred in excluding this period from the ordered remedy. We remand to require (absent resolving the claim) the Hearing Officer to address the issue of compensatory education for this period in the first instance. The Hearing

Officer may need to consider additional evidence to assess the scope of the implementation failures, such as the daily graphs and probe sheets referenced by Autism Coach Frederick and data the District has on the substitute teachers who occupied the kindergarten classroom during the 2020-2021 school year.

Although our review over determinations of compensatory education is plenary, we are mindful we should not "substitute [our] own notions of sound educational policy for those of the school authorities which [we] review."[356] We cannot make a quantitative assessment of the implementation failures on the existing record. "[I]n the Third Circuit, remand is appropriate for clarification of the record and when a hearing officer applies the wrong legal standard."[357]

We remand to the Hearing Officer to determine, consistent with his expertise and this memorandum, the amount of compensatory education to which S.C. is entitled between November 16, 2020 and December 12, 2021. Additional proceedings may be necessary to enable the Hearing Officer to fashion a more particularized award based on the guidance in this opinion and a calculation of the extent to which the District denied S.C. supports and services. On remand, the Hearing Officer should also determine and explain exactly what form the compensatory education should take.  Parents ask the compensatory education award be placed in a fund for S.C.'s benefit.

### C. Hearing Officer McElligott did not err in awarding full tuition reimbursement.

Hearing Officer McElligott found the District failed to provide S.C. with a free and appropriate public education for the period August 2021 to December 2021 and awarded full tuition reimbursement for the period December 2021 through the end of the 2021-2022 school year.[358] We have plenary review of the Hearing Officer's decision as to tuition reimbursement.

S.C. may be enrolled in an appropriate private school and the District may be obligated to reimburse parents for private tuition expenses if the District first fails to offer a free and appropriate

public education.[359] Congress through the IDEA authorizes tuition reimbursement for parents who unilaterally decide to place their child in an out-of-district school if the IEP proposed by the District failed to offer the child a free and appropriate public education and the placement the parents chose is proper under the IDEA.[360] Under the *Burlington-Carter* test, Parents are eligible to receive private tuition reimbursement if: "(1) the public school did not provide a [free and appropriate public education]; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement."[361]

### 1. Warwick is an appropriate placement.

Parents are entitled to tuition reimbursement only if we conclude, first, "public placement violated [the] IDEA."[362] We applied prong one of the *Burlington-Carter* analysis and we find the District denied S.C. a free appropriate public education for the period from August 2021 to December 2021.

The Hearing Officer applied the second prong of the *Burlington-Carter* analysis, concluding Warwick was an appropriate placement because "[t]he December 2021 IEP was appropriate, and the student made progress under the terms of the IEP, benefiting from significant learning in almost every goal area."[363] We agree the record supports a finding S.C. made progress on his goals in math, visual motor/fine-motor, reading comprehension, speech intelligibility, tacting, listener response, and manding (requesting).[364] He also made great strides in toilet training.[365] We see no reason to disturb the Hearing Officer's findings here and note Warwick need not meet all of the Act's FAPE requirements in order to make Parents eligible for reimbursement.[366]

The District argues Parents are not entitled to tuition reimbursement because Warwick is not an appropriate placement under the second test of the *Burlington-Carter* analysis even if the

Hearing Officer properly found the denial of FAPE under prong one. The District fails to meet its burden.

Congress provides:

> **Reimbursement for private school placement**. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.[367]

The District argues the Hearing Officer is without authority to award tuition reimbursement because Warwick is a public school. The District relies on a decision of the Court of Appeals for the Ninth Circuit. In *Minor v. Antioch Unified Sch. Dist.*, the parents of student N.F. withdrew N.F. from the Antioch School District and enrolled him in an online public charter school.[368] Despite the fact they enrolled their son in a *different* public school, Parents requested Antioch School District evaluate and offer an IEP to N.F. while he remained enrolled in the online public charter school so they could determine whether they were eligible for reimbursement for their alternative placement. The court of appeals considered whether the parents' request was appropriate under the IDEA's "Child Find" regulation requiring school districts to identify, locate, and evaluate children with disabilities within their local areas.[369] The regulation applies to "parentally-placed private school children with disabilities."[370] The court of appeals interpreted the plain language of the regulation to extend only to children enrolled by their parents in *private* schools. The court of appeals affirmed Judge Westmore's holding the public charter school—not the District—is responsible for providing the student's IEP, reasoning, "These [Child Find] regulations have no application here because it is undisputed that N.F. was enrolled in a public charter school, not a private institution."[371]

Parents distinguish the facts of *Minor* because it involved a District's Child Find obligations and did not address tuition reimbursement. The Parents cite to two separate regulations under the Act requiring public agencies "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services" and defining special education to include "[i]nstruction conducted in the classroom, in the home, in hospitals and institutions, and *in other settings*" in support of their argument they are entitled to a remedy not explicitly provided for in the language of the Act.[372]

Congress through the Act grants us plenary equitable powers to "grant such relief as [we] determine[] is appropriate."[373] The Supreme Court has long instructed "the only possible interpretation [of the Act] is that the relief is to be 'appropriate' in light of the purpose of the Act"—namely, providing children free appropriate public educations.[374] In *School Committee of Burlington v. Department of Education*, the father of a child with a disability rejected the school district's proposed IEP and sought review by a state agency.[375] While administrative review was pending, the father enrolled the child in a private school for special education at his own expense. The Supreme Court considered for the first time whether the IDEA authorizes reimbursement for the cost of private schooling when a parent unilaterally enrolls a child in private school because the public school failed to provide a FAPE. At the time of the decision, Congress did not explicitly refer to the possibility of reimbursement.

The Court reasoned the Act confers broad discretion to judges to fashion remedies as long as they are "appropriate" in light of the Act's purposes.[376] The Court explained in instances where a judge finds an IEP is improper and placement at a private school is appropriate to remedy the situation, "appropriate" relief would entail a prospective injunction directing school officials to develop an appropriate IEP placing the child in a private school.[377] But because administrative review and judicial review can take months to years, parents are faced with a decision of whether

48

to subject their child to deficient schooling or pay for what they consider to be an appropriate placement in the interim. The Court held it is empowered to grant retroactive reimbursement as a remedy, reasoning, Congress intended the Act to provide children "both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives."[378]

We too must exercise our broad discretion to fashion an appropriate remedy considering the purposes of the Act. Parents here could not access a free appropriate public education and considered other options for S.C. Parents testified they were unable to locate an appropriate private school able to support S.C.'s needs. They chose to enroll S.C. in a school district capable of providing S.C. with an appropriate program and placement. When they unilaterally moved their child to a public school, they did so "at their own financial risk."[379] As the Court explained in *Burlington*, "it would be an empty victory" for us to tell Parents they were right—the District denied their son an appropriate education—but they must bear the cost of the District's failure.[380] We do not make Parents choose between a free education and an appropriate one by denying them reimbursement for the cost of enrolling their child at Warwick. The Hearing Officer properly granted Parents the award of full tuition reimbursement.

We are not persuaded otherwise by the District's reliance on the Court of Appeals for the Ninth Circuit's analysis in *Minor* as the case did not involve the same equitable considerations presented to us. The court of appeals in *Minor* reviewed a decision concerning which school district must provide the student a free appropriate public education under the plain language in the Act. The court of appeals did not consider the issue of tuition reimbursement in *Minor*. We are instead persuaded by the Supreme Court's guidance in *Burlington* and by the many instances in which our colleagues departed from the strict language of the IDEA to fashion equitable remedies serving the purposes of the Act.[381]

The Hearing Officer found Warwick an appropriate placement under the third prong of the *Burlington-Carter* analysis. We see no reason to depart from his findings.

### 2.  Awarding tuition reimbursement does not violate the Spending Clause.

Congress enacted the IDEA using its powers under the Spending Clause.[382] "While Congress has broad power to set the terms on which it disburses federal money to the States, any conditions it attaches to a State's acceptance of such funds must be set out 'unambiguously.'"[383] "Fund recipients are bound only by those conditions that they accept 'voluntarily and knowingly,' and States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'"[384]

The District argues awarding tuition reimbursement to the Parents for placement at another public school violates the Spending Clause. The District contends because Congress provides States federal funds under the IDEA, it must provide clear notice to the States of the conditions upon which the funds are distributed so the States are fully informed when making the decision to accept the funds. The District asserts we cannot award tuition reimbursement for placement at a *public* school because the IDEA does not explicitly authorize (or provide "clear notice") this award is available.

The District cites to the Supreme Court's analysis over forty-two years ago in *Pennhurst State School & Hosp. v. Halderman* in arguing IDEA is a Spending Clause statute and must provide "clear notice" to states and fund recipients of the conditions for accepting funding.[385] The Court explained in *Pennhurst* "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."[386] "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, the [recipients] agree to comply with federally imposed conditions."[387] The Court explained

50

because of this important distinction, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" because a State or fund recipient cannot knowingly accept funds if it is "unaware of the conditions or is unable to understand what is expected of it."[388]

The District also relies on the Supreme Court's analysis in *Arlington Central School District Board of Education v. Murph* holding parents who prevailed in administrative proceedings under the IDEA could not recover expert fees the parents incurred.[389] In determining whether parents could recover expert fees, the Supreme Court began its analysis with the IDEA's text, reasoning if its "language is plain," judges must enforce it according to its terms.[390] The IDEA provides judges may award "reasonable attorneys' fees as part of the costs[.]"[391] As a Spending Clause statute, clear notice of liability for such fees is required in an action to enforce the IDEA.[392] Applying the "clear notice" mandate of *Pennhurst*, the Court reasoned "this provision does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts."[393] The Supreme Court reasoned  the term "costs" in the Act's fee-shifting provision is a term of art which does not ordinarily include expert fees. The use of the word costs, a term of art, rather than "expenses," suggests the provision is not meant to be "an open-ended provision that makes participating States liable for all expenses incurred by prevailing parents in connection with an IDEA case—for example, travel and lodging expenses or lost wages due to time taken off from work."[394] The Court also looked to other provisions of the Act, which are designed to ensure the awards of attorney's fees are reasonable and which notably do not mention expert fees anywhere.[395]

Parents respond the IDEA does not explicitly prohibit tuition reimbursement for placement at a public school. Parents argue the States are on clear notice of this potential remedy because the Act allows reimbursement for private school tuition and placement at an out-of-district public school at their own expense is "in essence no different than a private school because S.C. could

not attend this school without paying the tuition."[396] Parents also cite to other laws requiring public schools fund public services provided outside of its district, including Section 504 of the Rehabilitation Act which requires a public school district to fund the educational portion of a handicapped student's program in a public residential facility if necessary for the student to receive a FAPE.[397]

We are guided by a recent decision of the Court of Appeals for the Second Circuit in *J.S. v. N.Y. State Department of Corrections* addressing a Spending Clause challenge to the IDEA's fee-shifting provision.[398] The fee-shifting provision permits judges to award reasonable attorney's fees "to a prevailing party who is the parent of a child with a disability."[399] A twenty-year-old incarcerated person, J.C., prevailed in an administrative proceeding against the New York Department of Corrections for denying him a free appropriate public education.[400] The Department refused to pay J.S.'s attorney's fees and costs. Relying on the Supreme Court's decision in *Arlington*, Judge Sinatra dismissed for failure to state a claim reasoning the IDEA "unambiguously disallows J.S. from receiving a fee award" because only a "parent" of a child with a disability can prevail under the language of the Act.[401] The court of appeals reversed, finding J.S. may pursue an award of fees because the statutory phrase defining "parent" is broad enough to include J.S., Congress gave no textual indication it meant to exclude persons in J.S.'s situation from its definition, and its interpretation is confirmed by the broader statutory scheme.[402]

The court of appeals explained the IDEA defines "parent" to include "an individual who is legally responsible for the child's welfare."[403] When a child is under the age of 18, the person "legally responsible" is often someone other than the child. But the IDEA continues to apply between ages 18 and 21, when an adult child may seek relief on their own behalf. The court of appeals interpreted "parent" to include adult children because to find otherwise would undermine the purposes of the Act by finding a child is protected under the IDEA but unable to vindicate their

rights.[404] The court of appeals distinguished *Arlington*, reasoning "[f]rom the vantage of a state official…the fee-shifting provision did not furnish sufficiently clear notice that the state could be liable for expert fees on top of attorneys' fees."[405] The court of appeals also distinguished the Supreme Court's analysis in *Arlington* finding it: "speaks to recovery of a type of cost—non-attorney expert fees—that the statute did not address at all; here, we address liability for a type of cost—attorneys' fees—that the statute expressly allows."[406] In accepting IDEA funding, states committed to providing a FAPE to all children with disabilities and they are on notice if they fail to do so, they may be liable for reimbursing the prevailing party. The only information they may not have known is the identity of the prevailing party. This is not a violation of the Spending Clause because the provision gives "states ample notice of a possible obligation to pay fees to a prevailing" party.[407] "It is the notice of *liability* for a prevailing party's attorneys' fees, not the precise identity of the prevailing party, that is of operative significance."[408]

We distinguish *Arlington* on a similar basis. The District is right – there is no reference in the IDEA to reimbursement for a public school placement. But the notice of liability, not the precise identity of the placement, is of "operative significance."[409] While State officials may not have known exactly what type of placement they would be obligated to provide reimbursement for, Congress placed State officials on notice of their obligations to provide a FAPE to all children with disabilities including S.C. and they may be liable for reimbursement if they failed to do so. Nothing in the text of the IDEA suggested States could be liable for expert fees in *Arlington*.

We are also guided by our Supreme Court's decision in *Forest Grove Sch. Dist. v. T. A.*[410] T.A. attended public school in the Forest Grove School District from kindergarten through high school. A school psychologist evaluated him before he started high school and concluded he did not qualify for special education services. The family sought another opinion from a private specialist who diagnosed T.A. with attention deficit hyperactivity disorder and a number of

memory and learning related disabilities.[411] The parents enrolled T.A. in a private residential placement based on the specialist's advice. The hearing officer found the school district did not offer T.A. a free appropriate public education because it did not properly identify him as eligible for special education services. The hearing officer found the parents' private placement appropriate and ordered the school district reimburse T.A.'s parents for the cost of tuition.[412] The school district argued the hearing officer erred in granting reimbursement because the statute only provides reimbursement for students who "previously received special education and related services under the authority of a public agency" and T.A. did not receive special education services before the private placement.[413] The school district argued reimbursement was improper because the IDEA does not provide clear notice under the Spending Clause.

The Supreme Court began by looking at the language of the IDEA. The provision addressing reimbursement provides, "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer *may require* the agency to reimburse the parents for the cost of that enrollment…[.]"[414] The Court reasoned this provision is phrased permissively, as it provides courts "may require" reimbursement under certain circumstances but "it does not foreclose reimbursement awards in other circumstances."[415] The Court reasoned *Pennhurst's* notice requirement is clearly satisfied because States have been on notice since the *Burlington* decision the IDEA authorizes courts to order reimbursement in certain circumstances. The Court reasoned the Act is best read as "elaborating on the general rule that courts may order reimbursement when a school district fails to provide a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate."[416]

The Hempfield District makes a similar argument as the Forest Grove District made: the statute provides for reimbursement in only a certain limited number of circumstances (when parents place their child in a private school) and those circumstances are not present here so reimbursement is improper. But the Court made clear in *Forest Grove* the reimbursement provision is to be read permissively and we should not read it to prohibit what it does not authorize. Here, the reimbursement provision authorizes reimbursement for private school tuition but it does not prohibit reimbursement for public school tuition. The reimbursement provision lists factors affecting a reimbursement award in common situations in which parents believe a district's special education services are inadequate. But the situation before us, where parents paid for their child to receive special education services at a different public school, is not a common one. While "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," Spending Clause precedent does not require Congress to "prospectively resolve every possible ambiguity concerning particular applications" of a statute before we find a state accepted a condition of federal funds.[417] States have been on notice since *Burlington* they are required to reimburse parents for the costs of special educations in certain circumstances.

The District knew its obligation under the Act to provide a free appropriate public education and understood its obligation to reimburse Parents in the event they failed to provide one to S.C.  The District does not offer a reason, for our purposes today, how there is a meaningful difference between a parent who enrolls their child in a private school at their own financial risk and a parent who enrolls a child in an out-of-district public school at their own financial risk. The out-of-boundary public school is the only alternative for Parents' purposes. And Parents reasonably chose to do an out-of-boundary placement because it was less expensive than a private school without uprooting their family. We see no reason to punish the Parents for making a

reasonable decision after considering their options. The District's arguments suggest the student has no choice but to accept repeated deficiencies in implementing the IEP if the Parents cannot find or afford a private school near the district where they pay taxes.  We cannot find Congress precluded reimbursement to S.C.'s Parents given their options. Interpreting the IDEA in the manner suggested by the District today would penalize an autistic child because of where the child lives including the District's inability to provide the mandated services.

We exercise our broad remedial powers consistent with the purposes of the Act to award tuition reimbursement for S.C.'s public-school placement given today's facts We find obligating the District to reimburse Parents for the demonstrated tuition paid to Warwick School District does not violate the Spending Clause.

### D.   We find no present basis to award attorney's fees under IDEA but we grant Parents leave to file a fee petition.

Parents argue they are entitled to attorney's fees and costs under the Act as the prevailing parties on the claims for the 2020-2021 and 2021-2022 school years. We cannot grant their relief today as they did not adduce evidence to support a finding of attorney's fees under the IDEA. We grant them leave to file a fee petition.

Congress in the IDEA provides we, "in [our] discretion, may award reasonable attorneys' fees as part of the costs" "to a prevailing party who is the parent of a child with a disability[.]"[418] To "prevail" under the IDEA, Parents must obtain a "material alteration of the legal relationship of the parties" that is "judicially sanctioned."[419] A party achieves a "material alteration" of the parties' legal relationship and "prevail[s]" for attorneys' fees purposes only if he obtains relief that is "in some way merit[s]-based."[420]

The Parents are also entitled to reasonable attorney's fees after we find the District deprived S.C. of a free appropriate public education during the 2020-21 and 2021-22 school years.

But the Parents offer no evidence in support of their reasonable attorney's fees incurred in prevailing for the 2020-2021 and 2021-2022 school year. We deny the Parents' motion for reasonable attorney's fees under IDEA today without prejudice given the parties did not fully brief this issue given our rulings on the parties' cross-motions for judgment on the administrative record. We grant them leave to timely petition for fees.

### III.   Conclusion

Hearing Officer McElligott found and we agree the record establishes the District experienced staffing issues in the autistic support classroom during S.C.'s 2020-2021 kindergarten year and part of the 2021-2022 first grade year. But the Hearing Officer erred as a matter of law by focusing his FAPE analysis exclusively on S.C.'s progress over the kindergarten year and on the District's progress monitoring in the 2021-2022 first grade year. Applying the correct legal standard, we find the District failed to implement substantial or significant provisions of S.C.'s IEP, including toilet training, errorless teaching, and fast-paced instruction, and thus denied S.C. "a meaningful educational benefit" for the 2020-2021 school year and from August to December 2021.

We grant Parents' Motion for judgment on the administrative record in part finding (1) the District denied S.C. a free appropriate public education during the 2020-2021 school year, (2) the District denied S.C. a free appropriate public education from August to December 2021; and (3) the Hearing Officer correctly awarded tuition reimbursement for S.C.'s placement in the Warwick School District. We deny Parents' Motion for attorney's fees without prejudice to timely petitioning for attorney's fees along with the demonstrating the exact amount paid to Warwick School District for tuition.

We deny the District's Motion for judgment on the administrative record. We remand to the Hearing Officer to determine, consistent with his expertise and our guidance today, the amount

of compensatory education to which S.C. is entitled between November 16, 2020 and December 12, 2021 and what form the compensatory education should take.

---

[1] ECF No. 11-9 at 29. The parties filed the full administrative record at ECF No. 11. We will reference the record using the pagination assigned by the CM/ECF docketing system.

[2] ECF No. 11-7 at 6. S.C. was born premature at 29.5 weeks gestation.

[3] ECF No. 11-9 at 35.

[4] *Id.* at 35-148.

[5] *Id.* at 2.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 26-34.

[9] *Id.* at 35.

[10] *Id.* at 42.

[11] *Id.* at 46-52.

[12] *Id.* at 53-54. Errorless teaching is a teaching method frequently used in Applied Behavior Analysis therapy. The method involves using positive reinforcement combined with prompting strategies to teach new skills to students while minimizing the number of errors they make during the learning process. ECF No. 11-7 at 38; *see also*, Amelia Dalphonse, *Errorless Teaching: Complete Guide*, https://masteraba.com/errorless-learning/.

[13] *Id.* at 58.

[14] *Id.* at 62.

[15] ECF No. 11-9 at 25; ECF No. 11-10 at 2.

[16] ECF No. 11-7 at 5.

[17] ECF No. 11-6 at 55.

[18] *Id.*; 11-7 at 36; 11-9 at 301.

[19] ECF No. 11-6 at 7.

[20] ECF No. 11-9 at 68-82.

[21] ECF No. 11-6 at 35-37.

[22] *Id.* at 30, 49. Witnesses at the hearing often referred to the curriculum's assessment tool as the "VB-MAPP."

[23] ECF No. 11-6 at 6, 75, 78. Three of the classroom aides are personal care assistants and one is a paraprofessional, but they share the same duties in this classroom and we refer to them collectively as "aides." *Id.* at 76. Utilizing District guidelines, the District considered the autism support classroom to be fully staffed. *Id.* at 75.

[24] *Id.* at 8, 18, 40, 76-77, 79; ECF No. 11-7 at 29.

[25] ECF No. 11-6 at 49.

[26] *Id.*

[27] *Id.* at 74.

[28] ECF No. 11-7 at 30.

[29] ECF No. 11-9 at 75.

[30] *Id.* at 6.

[31] *Id.* at 75-80.

[32] *Id.* at 68-73.

[33] *Id.* at 6.

[34] *Id.* at 68-82.

[35] *Id.* at 68.

[36] *Id.* at 49.

[37] ECF No. 11-10 at 5.

[38] *Id.*

[39] ECF No. 11-6 at 48. Autism coach Frederick has a bachelor's degree in special education and a Master's degree in general rehabilitation and disability studies. *Id.* She also has a certificate in behavioral intervention in Autism through the University of Massachusetts. *Id.*

[40] *Id.*

[41] *Id.* at 6.

[42] *Id.* at 22-23, 45, 87.

[43] *Id.*

[44] ECF No. 11-9 at 83.

[45] *Id.* at 87.

[46] *Id.* at 83, 99-100.

[47] *Id.* at 103.

[48] ECF No. 11-6 at 59.

[49] *Id.* at 6, 31-32, 50.

[50] *Id.* at 51.

[51] *Id.*

[52] *Id.* at 7, 32, 50.

[53] *Id.* at 7, 32. One substitute would spend excessive time in the bathroom and request to watch the movie *Toy Story*. *Id.* at 32.

[54] ECF No. 11-6 at 7, 42; *see* 22 PA. CODE § 354.25(f).

[55] ECF No. 11-6 at 7, 32-33. Ms. Hilton testified there were two substitutes who blockaded themselves behind the desk and then did not return. *Id.* at 7-8.

[56] ECF No. 11-6 at 43.

[57] *Id.* at 23, 36.

[58] *Id.* at 21, 33.

[59] *Id.* at 58.

[60] *Id.* at 79-80.

[61] *Id.* at 7, 10, 20, 32, 50.

[62] *Id.* at 7, 32, 50.

[63] *Id.* at 60.

[64] *Id.* at 32; ECF No. 11-10 at 46.

[65] ECF No. 11-6 at 8.

[66] *Id.* at 9-10, 35.

[67] *Id.* at 9.

[68] ECF No. 11-10 at 46-49.

[69] *Id.*

[70] ECF No. 11-6 at 77, 88.

[71] *Id.* at 79.

[72] *Id.* at 52, 78.

[73] *Id.* at 88; ECF No. 11-7 at 10; ECF No. 11-9 at 306; ECF No. 11-10 at 23-25.

[74]  ECF No. 11-6 at 55; ECF No. 11-9 at 69.

[75] ECF No. 11-9 at 68.

[76] *Id.*

[77] *Id.* at 74.

[78] *Id.* at 74-82.

[79] *Id.* at 74.

[80] ECF No. 11-7 at 5.

[81] ECF No. 11-9 at 109-147.

[82] *Id.* at 128-137.

[83] *Id.* at 122.

[84] *Id.* at 122-123.

[85] *Id.* at 123. S.C. could independently unfasten zippers, buttons, and snaps and required minimal assistance to fasten zippers and buttons since starting to work on this in November 2020. *Id.*

[86] ECF No. 11-9 at 99-100, 138-39. The January 2021 IEP also provided S.C. would be exempt from mask wearing required by the District during the height of the COVID-19 pandemic.

[87] ECF No. 11-9 at 144.

[88] ECF No. 11-10 at 12.

[89] *Id.* at 50.

[90] *Id.* at 51.

[91] *Id.* at 53.

[92] *Id.* at 54.

[93] *Id.* at 55.

[94] *Id.* at 56-57.

[95] *Id.* at 58.

[96] *Id.* at 59.

[97] *Id.* at 60.

[98] *Id.* at 52.

[99] ECF No. 11-6 at 53.

[100] *Id.*

[101] *Id.* at 15, 35.

[102] ECF No. 11-7 at 12, 32.

[103] *Id.* at 32.

[104] ECF No. 11-10 at 46-49.

[105] ECF No. 11-6 at 23, 87.

[106] *Id.* at 14.

[107] *Id.* at 37.

[108] *Id.*

[109] ECF No. 11-7 at 33.

[110] *Id.*

[111] *Id.* at 34.

[112] ECF No. 11-6 at 14-15, 37-39.

[113] *Id.* at 15.

[114] ECF No. 11-7 at 33.

[115] ECF No. 11-6 at 80. Director Galen swore she could not post for the positions until they actually submitted their letters of resignation. ECF No. 11-6 at 80.

[116] ECF No. 11-6 at 79; ECF No. 11-9 at 306; ECF No. 11-10 at 23-25.

[117] ECF No. 11-9 at 306.

[118] *Id.*

[119] *Id.*

[120] ECF No. 11-6 at 85.

[121] ECF No. 11-9 at 306; ECF No. 11-10 at 45.

[122] ECF No. 11-10 at 45.

[123] *Id.*

[124] ECF No. 11-7 at 14.

[125] ECF No. 11-6 at 81.

[126] ECF No. 11-7 at 24.

[127] *Id.* at 14-15.

[128] ECF No. 11-6 at 15-16, 39.

[129] ECF No. 11-10 at 46-29.

[130] *Id.*

[131] *Id.*

[132] ECF No. 11-10 at 34.

[133] *Id.*

[134] ECF No. 11-7 at 14-15.

[135] *Id.* at 15.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 48.

[139] *Id.*

[140] *Id.* at 16.

[141] *Id.* The District disputed the amount of tuition Parents paid to Warwick in their written closing statement in the administrative proceedings. ECF No. 11-4 at 16 (citing to an exhibit which has since been removed from the administrative record). The District does not appear to dispute the amount of tuition in its appeal from the Hearing Officer's decision.

[142] ECF No. 11-9 at 311-12.

[143] *Id.*

[144] *Id.*

[145] ECF No. 11-7 at 35.

[146] ECF No. 11-10 at 50-60.

[147] *Id.* at 51, 53-54, 56-57, 59.

[148] *Id.* at 58.

[149] *Id.* at 51, 53, 55.

[150] *Id.* at 56.

[151] *Id.* at 50, 52, 55, 60.

[152] *Id.* at 52, 54.

[153] *Id.* at 55.

[154] ECF No. 11-7 at 11-12.

[155] ECF No. 11-9 at 166.

[156] ECF No. 11-6 at 62.

[157] ECF No. 11-9 at 166, 290.

[158] *Id.* at 166.

[159] *Id.* at 172.

[160] *Id.* at 166.

[161] ECF No. 11-6 at 55.

[162] *Id.* at 54.

[163] ECF No. 11-7 at 54. Assistant Superintendent Calendar had some knowledge of S.C.'s programs from her interactions with other Warwick personnel and her visits to his classroom, but she did not engage in any of the discussions about S.C.'s IEP.

[164] ECF No. 11-7 at 54.

[165] ECF No. 11-9 at 149.

[166] *Id.* at 166.

[167] *Id.* at 175.

[168] *Id.* at 166, 175.

[169] *Id.* at 184-189.

[170] *Id.* at 199.

[171] *Id.* at 190-194.

[172] *Id.* at 175.

[173] *Id.* at 193.

[174] *Id.* at 176.

[175] ECF No. 11-7 at 17.

[176] ECF No. 11-9 at 148-149. Warwick originally had an autistic support program at the elementary, middle, and high school levels but Warwick had to move the middle school program to the elementary school because of the high number of students enrolling in the program at the elementary level. ECF No. 11-7 at 54. The Warwick Assistant Superintendent swore the elementary programs are "somewhat split by grade level, so most of the primary students are together and most of the intermediate students are together, but it's not a hard and fast rule." *Id.*

The Hempfield School District maintained an age range requirement for its autistic support classroom.

[177] ECF No. 11-7 at 50.

[178] *Id.* at 54.

[179] *Id.* at 50.

[180] ECF No. 11-9 at 161.

[181] ECF No. 11-7 at 55-56.

[182] *Id.*

[183] ECF No. 11-9 at 161.

[184] *Id.* at 161-62.

[185] *Id.* at 161-63.

[186] *Id.* at 161. But S.C. had been reading up to third grade level sight words as of November 2020 at the Hempfield School District. ECF No. 11-9 at 81.

[187] ECF No. 11-9 at 162.

[188] *Id.* at 152.

[189] ECF No. 11-7 at 17; ECF No. 11-9 at 160.

[190] ECF No. 11-9 at 156-160.

[191] *Id.* at 176.

[192] ECF No. 11-7 at 17.

[193] *Id.*

[194] ECF No. 11-9 at 206-210.

[195] ECF No. 11-7 at 18.

[196] ECF No. 11-4 at 17.

[197] *Id.*

[198] ECF No. 11-9 at 206-210.

[199] ECF No. 11-7 at 17.

[200] *Id.* at 53.

[201] *Id.* at 17-18.

[202] ECF No. 11-6 at 64.

[203] ECF No. 11-11.

[204] ECF No. 11-11 at 1-3.

[205] ECF Nos. 11-6, 11-7.

[206] ECF No. 11-3 at 4.

[207] *Id.* at 11-12.

[208] *Id.*

[209] *Id.* at 12.

[210] *Id.* at 1-25.

[211] ECF No. 20-1 at 16 ("The Hearing Officer erred in two respects – first by determining whether FAPE was provided solely based upon the rate of a student's progress[.]"); ECF No. 22 at 4 ("Whether S.C. did, or did not make any, even de minimis progress, is not the ultimate determinant of whether the District provided S.C. with a FAPE.").

[212] ECF No. 19-1 at 10-11; ECF No. 20-1 at 16-17.

[213] ECF No. 19-1 at 12 ("The Hearing Officer's award of compensatory education for 65 days was completely arbitrary."); ECF No. 23 at 13 ("The decision to assign compensatory education for only thirteen weeks of an annual IEP—an IEP that was deemed appropriate at the time it was created in January of 2021—is arbitrary.").

[214] *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003); *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 524 (3d Cir. 1995) (holding we may reach an independent decision, except we must "accord the decision of the state agency 'due weight' in [our] consideration.").

[215] *Upper Darby Sch. Dist. v. K.W.*, No. 22-04343, 2023 WL 4826736, at *5 (E.D. Pa. July 27, 2023).

[216] *S.H.*, 336 F.3d at 270.

[217] *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).

[218] *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012).

[219] *S.H.*, 336 F.3d at 270.

---

[220] *Id.* (quoting *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)).

[221] *In re Educ. Assignment of Joseph R.*, 318 F. App'x 113, 118 (3d Cir. 2009) ("[T]he district court owes no deference to conclusions of law drawn by a state or local educational agency.").

[222] *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

[223] *Sch. Dist. of Phila. v. Post*, No. 15-4501, 2017 WL 2879684, at *5 (E.D. Pa. July 5, 2017) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).

[224] Congress, through the Individuals with Disabilities Education Improvement Act, provides "[any] party aggrieved by the findings and decision" of the state administrative hearing officer may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). When reviewing the complaint, we "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

[225] *D.K.*, 696 F.3d at 244 (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)).

[226] 20 U.S.C. § 1412(a)(1); *see also D.S.*, 602 F.3d at 556.

[227] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390-91 (2017). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. *Id.* (citing 20 U.S.C. §§ 1401(26), (29)).

[228] *Lauren G. ex rel. Scott G. v. W. Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 388 (E.D. Pa. 2012) ("The Third Circuit has 'held that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that the school districts provide a free and appropriate public education to each qualified handicapped person in its jurisdiction.'") (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 253 (3d Cir.1999)).

[229] *Endrew F. ex rel. Joseph F.*, 580 U.S. at 391 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

[230] *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)).

[231] *D.S.*, 602 F.3d at 557.

[232] *Endrew F. ex rel. Joseph F.,* 580 U.S. at 399.

233 *J.D.G. v. Colonial Sch. Dist.*, 748 F. Supp. 2d 362, 378 (D. Del. 2010) (citing 20 U.S.C. § 1414(d)(4)(A); *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 265 (3d Cir. 2003)).

234 *L.J. v. Sch. Bd.*, 927 F.3d 1203, 1215 (11th Cir. 2019).

235 *Id.* at 1215-16; *see also, Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n. 3 (8th Cir. 2003) (concluding content and implementation analyses "safeguard the same principles").

236 *L.J.*, 927 F.3d at 1216.

237 *Id.*

238 *Melissa S. v. Sch. Dist.*, 183 F. App'x 184, 187 (3d Cir. 2006).

239 *Id.* (quoting *T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)).

240 *Ridley Sch. Dist.*, 680 F.3d at 269 (quoting *D.S.*, 602 F.3d at 556).

241 *High v. Exeter Twp. Sch. Dist.*, No. 09-2202, 2010 WL 363832, at *4 (E.D. Pa. Feb. 1, 2010).

242 *D.S.*, 602 F.3d at 557.

243 *D.K.*, 696 F.3d at 243.

244 *Melissa S.*, 183 F. App'x at 187.

245 *Endrew F. ex rel. Joseph F.,* 580 U.S. at 399.

246 ECF No. 11-3 at 18.

247 *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

248 ECF No. 11-6 at 12, 31, 59.

249 *Id.* at 6, 31, 50.

250 *Id.* at 7, 32, 50.

251 *Id.* at 51.

252 *Id.* at 9, 23, 36.

253 ECF No. 11-3 at 18.

254 *Id.* at 17.

255 *L.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1214 (11th Cir. 2019) ("A child's actual educational progress (or lack thereof) can be evidence of the materiality of an implementation

failure—but it is not dispositive."); *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 822 (9th Cir. 2007) ("[W]e clarify that the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail. However, the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided.").

[256] *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. 17-3377, 2018 WL 2010915, at *1 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019).

[257] *Colonial Sch. Dist.*, 2018 WL 2010915, at *11 (E.D. Pa. Apr. 30, 2018) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176 (1982)).

[258] *Id.* at *12.

[259] *See Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (concluding content and implementation analyses "safeguard the same principles").

[260] *Melissa S.*, 183 F. App'x at 187 (internal citation omitted).

[261] *L.J.*, 927 F.3d at 1214.

[262] *Id.*

[263] *See also Perkiomen Valley Sch. Dist. v. S.D.*, 405 F. Supp. 3d 620, 632 (E.D. Pa. 2019) (finding Hearing Officer McElligot premised his FAPE conclusion on erroneous interpretation of progress data).

[264] *Stephen O. v. Sch. Dist. of Phila.*, No. 20-1991, 2021 WL 6136217, at *21 (E.D. Pa. Dec. 29, 2021).

[265] *Melissa S.*, 183 F. App'x at 187.

[266] *L.J.*, 927 F.3d at 1214 (citation omitted).

[267] *Id.*

[268] ECF No. 11-6 at 86-87.

[269] *Id.* at 5, 30.

[270] *Id.* at 10, 35.

[271] *Id.* at 12.

[272] *Id.* at 36.

[273] ECF No. 19-1 at 6.

[274] ECF No. 23 at 3.

[275] ECF No. 11-3 at 11-12.

[276] *Id.* at 18.

[277] ECF No. 11-6 at 68.

[278] ECF No. 11-9 at 88, 124 (emphasis added).

[279] *Id.* at 163, 195.

[280] ECF No. 11-10 at 54.

[281] *Id.* at 50-55.

[282] *Id.* at 59.

[283] *Id.* at 55.

[284] *Id.* at 58.

[285] *Id.* at 52.

[286] *Melissa S.*, 183 F. App'x at 186.

[287] *Id.* at 187.

[288] *Id.*

[289] *Id.* at 187-88.

[290] *Fisher v. Stafford Twp. Bd. of Educ.*, 289 F. App'x 520 (3d Cir. 2008).

[291] *Id.*

[292] *Id.* at 523-24.

[293] *J.C. v. Upper Darby Sch. Dist.*, No. 20-5030, 2022 WL 17324587 (E.D. Pa. Nov. 29, 2022). While the District relies on this decision in support of its argument, it appears the District did not read the decision closely. Contrary to the District's characterization, the student in *J.C. v. Upper Darby School District* did not have autism. The mother's concern centered around the fact the District placed her son in an autism support classroom when he did *not* have a diagnosis of autism.

[294] *Id.* at *3.

[295] *Id.*

[296] *Id.* at *8.

[297] ECF No. 11-6 at 35.

[298] *Id.* at 9.

[299] 642 F.3d 478 (4th Cir. 2011).

[300] *Id.* at 481.

[301] *Id.* at 483.

[302] *Sumter Cty. Sch. Dist. 17*, 642 F.3d at 485.

[303] *Id.* at 485-86.

[304] *Id.*

[305] ECF No. 11-6 at 15, 35, 45.

[306] *Id.* at 35, 38-39.

[307] ECF No. 11-7 at 16.

[308] Parents argue the District failed to provide S.C. with a one-to-one classroom aide. This is true, but S.C.'s kindergarten IEPs did not provide him a one-to-one aide; rather, they provided S.C. a personal care assistant for five-and-a-half hours per day. As Autism Coach Frederick explained, a personal care assistant is not the same as a one-to-one aide. ECF No. 11-6 at 76. Because a one-to-one aide is not listed as a service in S.C.'s IEP, we need not address this argument.

[309] *D.K.*, 696 F.3d at 243.

[310] *Melissa S.*, 183 F. App'x at 187.

[311] ECF No. 11-6 at 15-16, 39.

[312] ECF No. 11-7 at 35.

[313] ECF No. 11-3 at 19-20.

[314] ECF No. 11-7 at 33.

[315] *Id.*

[316] *Id.*

[317] ECF No. 11-6 at 37.

[318] ECF No. 11-7 at 34.

[319] ECF No. 11-6 at 14-15, 37-39.

[320] *Id.* at 14.

[321] *Id.* at 37.

[322] ECF No. 11-10 at 50-60.

[323] *Id.* at 55.

[324] *Id.* at 56-57.

[325] *Id.* at 50, 52, 60. The parties dispute the veracity of the Verbal Behavior Milestones Assessment conducted by Warwick School District before S.C.'s enrollment in December 2021 which revealed a regression of skills. We need not address this issue as we find the progress reporting for December 2021 provides enough evidence of S.C.'s lack of progress.

[326] ECF No. 11-6 at 15, 35, 38-39.

[327] ECF No. 23 at 8.

[328] *Id.* at 16-17.

[329] *See High*, 2010 WL 363832, at *4 ("[A] district court must consider the intellectual potential of the individual student when making its decision.").

[330] ECF No. 11-6 at 8, 15-16.

[331] *Id.* at 35.

[332] *Id.* at 39.

[333] ECF No. 11-10 at 40.

[334] ECF No. 11-9 at 302.

[335] ECF No. 11-10 at 16, 31.

[336] ECF No. 11-9 at 306.

[337] *Id.*; ECF No. 11-10 at 45.

[338] ECF No. 11-7 at 24.

[339] *Id.* at 14-15.

[340] ECF No. 11-10 at 34.

[341] ECF No. 23 at 4.

[342] ECF No. 11-7 at 33.

[343] The District argues the fact "no staff" raised concerns with the Special Education Administrator suggests the staffing issues are not "as severe" as the classroom aides' suggest. ECF No. 23 at 4. We do not find evidence concerning communication with Ms. Galen to be probative given she had almost no presence in the autistic support classroom during the 2020-2021 and 2021-2022 school years. We also note Ms. Galen testified some staff reached out to her asking about the District's progress in finding a new teacher for the autistic support classroom. ECF No. 11-6 at 77.

[344] *Lester H. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990).

[345] *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625 (3d Cir. 2015).

[346] *Stephen O.*, 2021 WL 6136217, at *3.

[347] *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996).

[348] *R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 349 (E.D. Pa. 2020).

[349] ECF No. 11-3 at 25.

[350] *Id.* at 22-23.

[351] ECF No. 19 at 1.

[352] *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 1:13-2379, 2015 WL 390864, at *18 (M.D. Pa. Jan. 28, 2015).

[353] *Id.* (quoting *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 608 (M.D. Pa. 2014)).

[354] *R.B.*, 509 F. Supp. 3d at 349.

[355] ECF No. 19-1 at 12 ("The Hearing Officer's award of compensatory education for 65 days was completely arbitrary."); ECF No. 23 at 13 ("The decision to assign compensatory education for only thirteen weeks of an annual IEP—an IEP that was deemed appropriate at the time it was created in January of 2021—is arbitrary.").

[356] *Rowley*, 458 U.S. at 206.

[357] *Matthew B. v. Pleasant Valley Sch. Dist.*, No. 3:17-2380, 2019 WL 5692538, at *15 (M.D. Pa. Nov. 1, 2019); *see also*, *Shane T. by & through Cathy K. v. Carbondale Area Sch. Dist.*, No. 3:16-0964, 2017 WL 4314555, at *9 (M.D. Pa. Sept. 28, 2017) (remanding to hearing officer to make findings related to the second and third factor in the *Burlington-Carter* test); *Downingtown Area Sch. Dist. v. D.S. by & through C.S.*, No. 20-0892, 2022 WL 523563, at *13 (E.D. Pa. Feb. 22, 2022) (remanding to hearing officer to calculate compensatory education); *A.W. ex rel. H.W.*, 2015 WL 390864, at *18 ("Given the Hearing Officer's expertise in this subject, the court concludes that the Hearing Officer should address the issue of compensatory education in the first instance.").

[358] ECF No. 11-3 at 23-25.

[359] 20 U.S.C. § 1412(a)(10)(C)(ii).

[360] *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993).

[361] *R.B.*, 509 F. Supp. 3d at 352 (citing *Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 374). The *Burlington-Carter* test is named after two Supreme Court cases which together provide us with the three-step analysis to evaluate tuition reimbursement claims. *See Burlington*, 471 U.S. at 370; *Carter*, 510 U.S. at 15. In *Burlington*, the Supreme Court held Congress's grant of equitable authority in the IDEA empowers us "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, 471 U.S. at 360. In *Carter*, the Supreme Court held if we find the District violated the IDEA we must then consider all relevant factors to determine whether private placement is appropriate and whether the equities weigh in favor of reimbursement. *Carter*, 510 U.S. at 15–16.

[362] *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 68 (3d Cir. 2015) (citation omitted).

[363] ECF No. 11-3 at 24 (citing Findings of Fact ¶¶ 48, 52-54).

[364] ECF No. 11-9 at 206-210.

[365] ECF No. 11-6 at 64.

[366] *See Florence Cnty. Sch. Dist. Four*, 510 U.S. at 13.

[367] 20 U.S.C. § 1412(a)(10)(C)(ii).

[368] *N.F. by & through Flyte v. Antioch Unified Sch. Dist.*, No. 21-16260, 2022 WL 1125645, at *1 (9th Cir. Apr. 15, 2022).

[369] *Id.*

[370] *Id.* (quoting 34 C.F.R. § 300.130)).

[371] *Id.*

[372] ECF No. 26 at 1-2 (citing 34 C.F.R. § 300.115; 34 C.F.R. § 300.39).

[373] 20 U.S.C. § 1415(i)(2)(C)(iii).

[374] *Burlington*, 471 U.S. at 369.

[375] *Id.* at 362.

---

[376] *Id.* at 369.

[377] *Id.* at 370.

[378] *Id.* at 372.

[379] *Id.* at 373-74 ("While we doubt that this provision would authorize a court to order parents to leave their child in a particular placement, we think it operates in such a way that parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk.").

[380] *Id.* at 370.

[381] *See, e.g., Ferren C. v. Sch. Dist. Of Philadelphia*, 595 F. Supp. 2d 567 (E.D. Pa. 2009) (awarding compensatory education past the age of twenty-one for equitable reasons even though student's right to a FAPE ends at age twenty-one); *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497-98 (3d Cir. 2012) (finding family's claims for compensatory education under the IDEA are not mooted because they moved out of the school district (and the state) after they initiated a due process proceeding, finding if the court of appeals held otherwise, it "would create an enormous loophole in that obligation and thereby substantially weaken the IDEA's protections."); *Westendorp v. Indep. Sch. Dist.*, 35 F. Supp. 2d 1134, 1135 (D. Minn. 1998) (ordering the public school district to "provide a classroom paraprofessional aide to [the student] at the school chosen by his parents because the District violated the student's rights under the IDEA.").

[382] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006).

[383] *Id.* at 291.

[384] *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

[385] 451 U.S. 1 (1981).

[386] *Id.* at 17.

[387] *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) (cleaned up) (citations and quotations omitted).

[388] *Pennhurst*, 451 U.S. at 17.

[389] 548 U.S. 291 (2006).

[390] *Id.* at 296.

[391] *Id.* at 297 (citing 20 U.S.C. § 1415(i)(3)(B)).

[392] *Id.* at 291-92.

[393] *Id.* at 297.

[394] *Id.*

[395] *Id.* at 298.

[396] ECF No. 26 at 4.

[397] ECF No. 26 at 2 (citing 34 C.F.R. § 104.33(c)(3); 24 Pa. Cons. Stat. § 13-1306).

[398] 76 F.4th 32 (2d Cir. 2023).

[399] *Id.* at 36 (citing 20 U.S.C. § 1415(i)(3)(B)(i)(I)).

[400] *Id.* at 35.

[401] *Id.* at 37-38.

[402] *Id.* at 39-40.

[403] *Id.* at 40-41 (citing 20 U.S.C. § 1401(23)(C)).

[404] *Id.* at 42.

[405] *Id.* at 47.

[406] *Id.* at 48.

[407] *Id.* at 48-49.

[408] *Id.* at 48 (emphasis in original).

[409] *Id.* at 48.

[410] 557 U.S. 230 (2009).

[411] *Id.* at 234.

[412] *Id.* at 235.

[413] *Id.* at 235.

[414] 20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).

[415] *Forest Grove*, 557 U.S. at 241.

[416] *Id.* at 242.

[417] *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985).

[418] 20 U.S.C. § 1415(i)(3)(B)(i).

[419] *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017).

[420] *Id.* (citation omitted).